# 23-7652

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Elliot McGucken, an individual,

*Plaintiff-Appellant*,

v.

Shutterstock, Inc., a Delaware corporation,

*Defendant-Appellee,*

Does 1-10,

*Defendant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, CASE NO. 1:22-CV-905, HONORABLE JENNIFER H. REARDEN

## BRIEF OF APPELLANT

DONIGER / BURROUGHS
Scott Alan Burroughs, Esq.
scott@donigerlawfirm.com
247 Water Street, First Floor
New York, New York 10038
Telephone: (310) 590-1820

*Counsel for Plaintiff-Appellant*
*Elliot McGucken*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Plaintiff-Appellant states that Plaintiff-Appellant Elliot McGucken is a natural person.

Dated: February 13, 2024                    Respectfully submitted,


By:    <u>*/s/ Scott Alan Burroughs*</u>
       Scott Alan Burroughs, Esq.
       DONIGER / BURROUGHS
       *Attorneys for Plaintiff-Appellant*

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT…………………………………..i

TABLE OF CONTENTS……………………………………………………..ii

TABLE OF AUTHORITIES…………………………………………....iii

JURISDICTIONAL STATEMENT……………………………………….iv

I.     INTRODUCTION AND ARGUMENT SUMMARY………………………1

II.    STATEMENT OF ISSUES PRESENTED…………………………………2

III.   STATEMENT OF THE CASE…………………………………………...3

        A. McGucken created and owns the McGucken Photographs…………..3

        B. Shutterstock's licensing business…………………………………..4

        C. Shutterstock's infringement…………………………………………..7

        D. Shutterstock's licensees' infringement………………………………9

        E. Shutterstock's reckless conduct………………………………..11

IV.    STANDARD OF REVIEW…………………………………………..12

V.     THE DIGITAL MILLENNIAL COPYRIGHT ACT ("DMCA")…………13

VI.    ARGUMENT……………………………………………………14

        A. The §512 safe harbor does not excuse Shutterstock's

        infringement……………………………………………………14

            1.  The district court erred by concluding that Shutterstock

                proved that its infringing acts were covered by §512(c)……14

a.  Shutterstock's infringement did not occur by reason
of the storage at the direction of a user of "infringing
material in Shutterstock's online store"………………15

    i.  Shutterstock decided to include McGucken's
photographs in its online store…………………17

    ii.  Shutterstock itself made and distributed
unauthorized copies of the McGucken
Photographs……………………………………..19

b.  Shutterstock's infringement was not "by reason of"
the storage of McGucken's photographs in its
store…………………………………………………22

    i.  Shutterstock's infringing distribution of
McGucken's photographs to its licenses and
advertising partners is not covered by §512…….24

    ii.  Shutterstock's reproduction of McGucken's
photographs and creation of derivatives
therefrom is not covered by §512………………25

c.  Shutterstock's infringement includes material
residing on third-party systems………………………..27

d. Shutterstock financially benefitted from and had the right and ability to control the infringement..........28

    i. Shutterstock financially benefited from the infringement…………………………………28

    ii. Shutterstock had the right and ability to control the infringing activity…………………...29

e. Shutterstock failed to prove it was unaware of the infringement and acted expeditiously to remove the infringing content……………………………………...34

f. The district court's analysis creates a split of authority……………………………………………...37

2. Shutterstock's is not a "service provider"…………………..39

3. Shutterstock does not satisfy §512(i)………………………43

    a. Shutterstock did not adopt and reasonably implement a repeat infringer policy…………………...43

    b. Shutterstock failed to accommodate a standard technical measure……………………………………...45

4. Extending the safe harbor to Shutterstock contravenes Congressional intent…………………………………………...47

5.  Second Circuit precedent precludes the safe harbor's

    application…………………………………………………..49

B.  Shutterstock violated 17 U.S.C. §1202………………………………...51

    1.  Shutterstock violated 17 U.S.C. §1202(a)…………………..51

    2.  Shutterstock violated 17 U.S.C. §1202(b)…………………55

C.  The district court erred by failing to rule on two of the three

    causes of action at issue…………………………………………………..56

    1.  Shutterstock is vicariously liable for copyright

        infringement…………………………………………………...57

    2.  Shutterstock is liable for contributory infringement………..60

D.  The district court erred by overlooking McGucken's claim for

    injunctive relief…………………………………………………………...61

VII.    CONCLUSION………………………………………………………62

CERTIFICATE OF COMPLIANCE…………………………………………...64

CERTIFICATE OF SERVICE……………………………………………………65

## TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s):**

*Aaberg v. Francesca's Collections, Inc.*,

   2018 WL 1583037 (S.D.N.Y. 2018) .................................................................. 51

*Advance Magazine Publishers, Inc. v. Leach*,

   466 F. Supp. 2d 628 (D. Md. 2006).................................................................. 25

*Agence France Presse v. Morel*,

   934 F. Supp. 2d 547 (S.D.N.Y. 2013) .......................................................... 40, 41

*Am. Corp. v. Universal Video, Inc.*,

   2006 WL 767871 (E.D.N.Y. 2006) (denying motion.......................................... 42

*Arista Recs., LLC v. Doe 3*,

   604 F.3d 110 (2d Cir. 2010) ............................................................................ 23

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,

   943 F.3d 568 (2d Cir. 2019) ............................................................................ 12

*BMG Rights Mgmt. (U.S.) LLC v. Cox Commc'ns, Inc.*,

   881 F.3d 293 (4th Cir. 2018) ............................................................................ 44

*Bodyguard Prods., Inc. v. RCN Telecom Servs., LLC*,

   2022 WL 6750322 (D.N.J. 2022) .................................................................... 29

*Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*,

    2021 WL 5359671 (D. Md. 2021) .................................................................. 24, 25

*Bus. Casual Holdings, LLC v. YouTube, LLC*,

    2023 WL 6842449 (2d Cir. 2023) ........................................................................ 14

*BWP Media USA Inc. v. Polyvore, Inc.*,

    922 F.3d 42 (2d Cir. 2019) ............................................................. 19, 20, 22, 32

*Capitol Recs., Inc. v. MP3tunes, LLC*,

    821 F. Supp. 2d 627 (S.D.N.Y. 2011) .................................................................. 13

*Capitol Recs., LLC v. Escape Media Grp., Inc.*,

    2015 WL 1402049 (S.D.N.Y. 2015) ............................................................... 24, 49

*Capitol Recs., LLC v. ReDigi Inc.*,

    934 F. Supp. 2d 640 (S.D.N.Y. 2013) ............................................................ 58, 59

*Capitol Recs., LLC v. Vimeo, LLC*,

    826 F.3d 78 (2d Cir. 2016) ...................................................................... 14, 32, 50

*Chinese Anti-Cult World All. Inc.*,

    16 F.4th 47 (2d Cir. 2021) .................................................................................. 12

*Clark v. Chubb Group of Ins. Cos.*,

    337 F.3d 687 (6th Cir. 2003) .............................................................................. 57

*Columbia Pictures Inds., Inc. v. Fung*,

    710 F.3d 1020 (9th Cir. 2013) ............................................................................ 29

*Corbis Corp. v. Amazon.com, Inc.*,

    351 F. Supp. 2d 1090 (W.D. Wash. 2004) ..................................................... 61, 62

*Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*,

    62 F.4th 748 (2d Cir. 2023) .................................................................. 13

*Disney Enters., Inc. v. Hotfile Corp.*,

    2013 WL 6336286 (S.D.Fla., 2013) .................................................... 36

*Dole v. United Steelworkers of Am.*,

    494 U.S. 26, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990)........................................... 40

*Dualite Sales & Serv., Inc. v. Moran Foods, Inc.*,

    194 F. App'x 284 (6th Cir. 2006) ........................................................ 57

*Ellison v. Robertson*,

    357 F.3d 1072 (9th Cir. 2004) ........................................................ 29, 61

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,

    844 F.3d 79 (2d Cir. 2016) ........................................................ Passim

*Fame Publ'g Co. v. Ala. Custom Tape, Inc.*,

    507 F.2d 667 (5th Cir.1975) ............................................................ 13

*Feingold v. RageOn, Inc.*,

    472 F. Supp. 3d 94 (S.D.N.Y. 2020) .................................................. 36

*Friedman v. Live Nation Merch., Inc.*,

    833 F.3d 1180 (9th Cir. 2016) .............................................. 52, 55, 56

*Gardner v. CafePress Inc.*,

   2014 WL 794216 (S.D. Cal. 2014) ................................................................ 42, 46

*Gallo v. Prudential Residential Servs., Ltd. P'ship*,

   22 F.3d 1219 (2d Cir. 1994) ................................................................................ 13

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*,

   443 F.2d 1159 (2d Cir. 1971) ......................................................................... 58, 59

*Greg Young Publishing, Inc. v. Zazzle, Inc.*,

   2017 WL 2729584 (C.D. Cal. 2017) ................................................................... 31

*Horn v. Med. Marijuana, Inc.*,

   80 F.4th 130 (2d Cir. 2023) ............................................................................... 12

*In re Aimster Copyright Litig.*,

   334 F.3d 643 (7th Cir. 2003) ............................................................................. 45

*Michael Grecco Prods., Inc. v. Alamy, Inc.*,

   372 F. Supp. 3d 131 (E.D.N.Y. 2019) .............................................. 31, 41, 52, 54

*Penske Media Corp. v. Shutterstock, Inc.*,

   548 F. Supp. 3d 370 (S.D.N.Y. 2021) ........................................................... Passim

*JLM Couture, Inc. v. Gutman*,

   2024 WL 172609, fn. 2 (2d Cir. 2024) ............................................................... 40

*Kinsley v. Udemy, Inc.*,

   2021 WL 1222489 (N.D. Cal. 2021) ............................................................. 30, 36

*LLC v. Usenet.com, Inc.*,

    633 F. Supp. 2d 124 (S.D.N.Y. 2009) .................................................... 30

*Mango v. BuzzFeed, Inc.*,

    356 F. Supp. 3d 368 (S.D.N.Y. 2019) ............................................. 46, 52

*Mango v. BuzzFeed, Inc.*,

    970 F.3d 167 (2d Cir. 2020) .................................................... 51, 55, 56

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,

    873 F.3d 1045 (9th Cir. 2017) ..................................................... Passim

*McGucken v. Shutterstock*, *Inc.*,

    2023 WL 6390530 (S.D.N.Y. 2023) ........................................... Passim

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,

    545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005)............................. 57, 59

*Nemir v. Mitsubishi Motors Corp.*,

    381 F.3d 540 (6th Cir.2004) ................................................................ 57

*Parker v. Google, Inc.*,

    242 F. App'x 833 (3d Cir. 2007) ....................................................... 29

*Playboy Enterprises, Inc. v. Webbworld, Inc.*,

    991 F. Supp. 543 (N.D. Tex. 1997) .................................................... 43

*Post Univ. v. Course Hero, Inc.*,

    2023 WL 5507845 (D. Conn. 2023)..................................................... 52

*Recording Indus. Ass'n of Am. v. Univ. of N.C. at Chapel Hill*,

   367 F.Supp.2d 945 (M.D.N.C.2005) ................................................... 41

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Services, Inc.*,

   351 F.3d 1229 (D.C. Cir. 2003).......................................................... 62

*Roadget Bus. Pte. Ltd. v. PDD Holdings Inc.*,

   2023 WL 4865005 (N.D. Ill. 2023) .................................................... 39

*Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*,

   2011 WL 1598916 (C.D. Cal. 2011) ...................................... 16, 17, 25

*Seide v. Level-(1) Glob. Sols., LLC*,

   2016 WL 4206076,n.5 (N.D. Ill. 2016) .............................................. 36

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,

   316 F.2d 304 (2d Cir.1963) ............................................................... 58

*Shihab v. Complex Media, Inc.*,

   2022 WL 3544149 (S.D.N.Y. 2022) ...................................... 53, 55, 56

*SHL Imaging, Inc. v. Artisan House, Inc.*,

   117 F. Supp. 2d 301 (S.D.N.Y. 2000) ................................................ 27

*Sid Avery & Assocs., Inc. v. Pixels.com, LLC*,

   479 F. Supp. 3d 859 (C.D. Cal. 2020) ................................... 18, 39, 58

*Silvers v. Sony Pictures Ent., Inc.*,

   402 F.3d 881 (9th Cir. 2005) .............................................................. 37

*Steinmetz v. Shutterstock, Inc.*,

   629 F. Supp. 3d 74 (S.D.N.Y. 2022) ............................................... 33, 43

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,

   384 F. Supp. 3d 743 (W.D. Tex. 2019) ................................................ 44

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,

   718 F.3d 1006 (9th Cir. 2013) ................................................ 17, 28, 38

*UMG Recordings, Inc. v. Veoh Networks Inc.*,

   665 F. Supp. 2d 1099 (C.D. Cal. 2009) ................................................ 34

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,

   620 F.Supp.2d 1081 (C.D. Cal. 2008) ............................................ 16, 38

*Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*,

   142 S.Ct. 941 (2022) ............................................................ 14

*United States v. Richardson*,

   437 F.3d 550 (6th Cir.2006) ...................................................... 57

*United States v. Texas*,

   507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993)...................................... 13

*Ventura Content, Ltd. v. Motherless, Inc.*,

   885 F.3d 597 (9th Cir. 2018) ...................................................... 30

*Ventura Content, Ltd.*,

   2013 WL 11237204 (C.D. Cal. 2013) ................................................ 35

*Venus Fashions, Inc. v. ContextLogic, Inc.*,

    2017 WL 2901695 (M.D. Fla. 2017) ................................................... 29

*VHT, Inc. v. Zillow Grp., Inc.*,

    918 F.3d 723 (9th Cir. 2019) ............................................................. 39

*Viacom Int'l Inc. v. YouTube, Inc.*,

    940 F. Supp. 2d 110 (S.D.N.Y. 2013) ................................................ 30

*Viacom Int'l, Inc. v. YouTube, Inc.*,

    676 F.3d 19 (2d Cir. 2012) ......................................................... Passim

*Weissmann v. Freeman*,

    868 F.2d 1313 (2d Cir. 1989) ........................................................... 26


**Statutes:**

17 U.S.C. § 101 ....................................................................................... 9

17 U.S.C. § 106 ................................................................................ 16, 23

17 U.S.C. § 106(1) ................................................................................ 26

17 U.S.C. § 106(2) ................................................................................ 26

17 U.S.C. § 106(3) ................................................................................ 24

17 U.S.C. § 512 ............................................................................. Passim

17 U.S.C. § 512(a)-(d) .......................................................................... 40

17 U.S.C. § 512(a)-(d), (j) .................................................................... 62

17 U.S.C. § 512(c) ................................................................ Passim

17 U.S.C. § 512(c)(1) ...................................................... 15

17 U.S.C. § 512(c)(1)(B) ................................................. 28

17 U.S.C. § 512(c)(A)(i-ii) .............................................. 34

17 U.S.C. § 512(i) ............................................................ 43

17 U.S.C. § 512(i)(1)(A) .................................................. 44

17 U.S.C. § 512(j) ............................................................ 62

17 U.S.C. § 512(k)(1) ....................................................... 40

17 U.S.C. §1202 ......................................................... 2, 51

17 U.S.C. § 1202(a) ........................................ 51, 52, 53, 54

17 U.S.C. § 1202(b) ......................................................... 55

17 U.S.C. 1202(c)(2)-(3) ................................................. 51

28 U.S.C. § 1291 ............................................................... 9

28 U.S.C. § 1331 ............................................................... 9

28 U.S.C. § 1338 ............................................................... 9

**Rules:**

Fed. R. App. P. 26.1 ......................................................... 1

Fed. R. App. P. 28 ............................................................. 9

Fed. R. App. P. 32(a)(5) ................................................... 64

Fed. R. App. P. 32(a)(6) ........................................................... 64

Fed. R. App. P. 32(f) ............................................................... 64

Fed. R. Civ. P. 56(a) ............................................................... 13

## **Other Authorities:**

H.R. Rep. No. 105-551, Pt. 1 (1998) ...................................... 35

H.R. Rep. No. 105–551, Pt. 2 (1998) ..................................... 16

S. Rep. No. 105-190 (1998) .................................................... 49

## JURISDICTIONAL STATEMENT

Per F.R.A.P. 28, undersigned counsel for Plaintiff-Appellant, Elliot McGucken, states:

The district court had subject matter jurisdiction over this matter because it arose under the Copyright Act of 1976, Title 17 U.S.C. § 101 *et seq*, and the court thus had federal question jurisdiction under 28 U.S.C. § 1331 and 1338 (a) and (b).

This Court has jurisdiction under 28 U.S.C. § 1291 over this appeal because it arises from a final decision rendered by the District Court for the Southern District of New York.

This appeal is timely brought, as Appellant filed his notice of appeal on October 31, 2023, within 30 days of the entry of judgment in the district court on October 12, 2023. This appeal is from a final order or judgment on the parties' summary judgment motions that in effect disposed of all parties' claims.

Dated: February 13, 2024                    Respectfully submitted,


                                   By:    */s/ Scott Alan Burroughs*
                                          Scott Alan Burroughs, Esq.
                                          DONIGER / BURROUGHS
                                          *Attorneys for Plaintiff-Appellant*

## I.   INTRODUCTION AND ARGUMENT SUMMARY

The district court erred in excusing Shutterstock, Inc.'s copyright infringement – including its sale of 938 illicit copyright licenses – on the basis that Shutterstock marketed and sold those licenses through its website.

Plaintiff-Appellant, Dr. Elliot McGucken, is a professional photographer. Defendant-Appellee, Shutterstock, curates an online store that sells photography licenses to customers including, publishers and merchandisers, who then incorporate the photographs into articles and merchandise. Shutterstock claims to be a passive service provider, like YouTube or Facebook, that allows users to immediately post content for public viewing. But it is instead like Walmart or any other retailer, selling licenses for curated content that it selects from third-party suppliers.

Shutterstock, without McGucken's consent, sold 938 licenses for McGucken's photographs to its customers. This is textbook infringement. The district court erred in finding this infringement to be excused by 17 U.S.C. § 512(c)'s safe harbor, under which websites are not liable for monetary relief "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider[.]" Shutterstock, though, is not a "service provider," its infringement was not the result of "storage at the direction of the user," and the

1

infringing material "resided" in large part on third-party networks. Reversal is thus appropriate.

## II.    STATEMENT OF ISSUES PRESENTED

There are two questions before this Court:

(1) does the §512(c) "safe harbor," which was enacted to protect online bulletin board operators from liability for material posted on their boards, protect a commercial licensing company's direct sale of 938 licenses for McGucken's photographs?

(2) does the intentional removal of an author's copyright management information ("CMI") from photographs and replacement of that CMI with an infringer's own watermark and logo violate 17 U.S.C. §1202, which forbids removing CMI from, and adding false CMI to, a photograph?

The first answer is "no." The statute's text establishes that the "safe harbor" does not apply to Shutterstock, which controlled and directly licensed the infringing photographs to its customers.

The second answer is "yes." Metadata, names, and logos all constitute CMI. Shutterstock stripped McGucken's metadata from his photographs before adding its own name and logo to same. This violated §1202.

Each above issue provides a discrete basis to reverse. As does the fact that the district court: (a) failed to rule on McGucken's vicarious and contributory

2

infringement causes of action, both of which were addressed in the parties' briefing; and (b) dismissed the case despite the extant availability of injunctive relief. As ventilated below, this Court should reverse the district court's order and direct the entry of summary adjudication in McGucken's favor, or, in the alternative, remand for trial.

## III. STATEMENT OF THE CASE

This is a copyright infringement action. McGucken filed his complaint on February 2, 2022 and amended same on April 29, 2022 to incorporate additional infringements. Dkt. Nos. 1, 17. On January 20, 2023, the parties filed cross-motions for summary judgment and on February 17, 2023 they filed oppositions. Dkt. Nos. 98, 106, 118, 129. On March 3, 2023, they filed replies. Dkt. Nos. 131, 134. On September 30, 2023, the Honorable Jennifer H. Rearden granted Shutterstock's motion, denied McGucken's, and entered judgment. *McGucken v. Shutterstock*, *Inc*., 2023 WL 6390530 (S.D.N.Y. 2023); Dkt. Nos. 138, 139. On October 31, 2023, McGucken timely appealed. Dkt. No. 146.

### A. McGucken created and owns the McGucken Photographs

McGucken is an award-winning, professional photographer. **App.216, 367**. He licenses his photography to publications, merchandisers, and others. **App.216, 873-880.** He created the 337 original photographs ("McGucken Photographs") at issue. **App.216, 379-714, 1630-1642**. McGucken included metadata in the

McGucken Photographs identifying him as their author and copyright owner, and routinely published the works with this copyright management information ("CMI"). **App.216, 715-873.** He registered his copyright ownership for the McGucken Photographs with the Copyright Office. **App.217.**

### B. Shutterstock's licensing business

Shutterstock markets and sells photography licenses to the public via its online store. **App.220, 881-887**. It sources its photography from third parties including the public and commercial publishers like Penske Media. **Id.**; *Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370, 373 (S.D.N.Y. 2021)(dispute over license for thousands of photographs). These licenses and subscription packages permit Shutterstock's paying customers to exploit Shutterstock's curated collection of photography in articles and on websites and products. **App. 1132-1136**. Shutterstock offers clients full-size photographs in high-resolution individually, as part of subscription packages, or at times as promotional "trial" downloads. **App. 1318-1319**. Shutterstock's clients and licensees pay a monthly rate (from at least $29.00 to $479.00) to use all of Shutterstock's photography or an annual per-photograph rate (from at least $29.00 to $229.00) to exploit a particular Shutterstock photograph. **App. 888-890**.

Shutterstock's photography portfolio is heavily curated, and the "breadth and quality of [its] content offerings are critical to [its] success."[1] **App. 891-898**,

**1610-1611**. Shutterstock advertises that "unlike the significant majority of free images available online, [its] rigorous vetting process enables [it] to provide confidence and indemnification to [its] users that the images in [its] library have been appropriately licensed for commercial or editorial use." **App. 993**.

Shutterstock "source[s] high-quality content from contributors, and license[s] [sic] that content to customers worldwide." **App. 1067.** Most of its photographs are sourced from a pre-approved network of verified contributors recruited through "marketing" and "referrals." **App. 1279-1281.** Shutterstock reviews and approves its contributors' credentials before allowing them to contribute photography to be considered for inclusion in Shutterstock's portfolio. **App. 993**. And Shutterstock does not allow any photograph to appear in its online store "unless and until a Shutterstock reviewer approves a particular photograph." **App. 1305-1307**.

This review process is thorough. Aspiring contributors must apply for the opportunity to submit photographs and "meet [Shutterstock's] robust quality standards" to qualify. **App. 897, 993**. Once approved, contributors submit photographs for Shutterstock's "specialized team of reviewers" to review to ensure they meet its standards for "quality and licensability." If questions arise, Shutterstock's team of review coordinators, who oversee the reviewer team, opines on whether to approve a photograph. **App. 1313-1315**. To decide whether its

standards are met, Shutterstock's team reviews the photographs' subject matter, commercial appeal, and technical quality. **App. 1069, 1297-1298, 1343-1344.** They also review the photograph's metadata. **App. 1069, 1339-1340; 1625-1629**. In sum, Shutterstock's "trained team of reviewers" completes "a comprehensive evaluation of all content submissions." **App. 897**.

At the review stage, the photographs are stored in Shutterstock's private review portal and are *not* viewable on Shutterstock's site. **App. 1305-1307**. If Shutterstock approves a photograph, it makes a copy available in its online store, where it appears to the public. **App. 897, 1338**.[2] During this process, Shutterstock selects only a portion of submissions and regularly rejects photographs for "30-odd rejection reasons," including stylistic and aesthetic issues such as lighting, blurriness, composition, and framing. **App. 1070-1088**, **1095**, **1294-1295**.

After Shutterstock approves a photograph, it creates a dedicated "asset detail page" that it makes public at a unique URL in its retail store to provide details about the work and available licenses. **App. 1110-1112, 1419-1420.** As part of this process, Shutterstock makes *multiple* copies of each photograph it adds to its online store, assigning each at least two unique URLs. **App. 1229-1238.**

Shutterstock then contracts *directly* with its licensees to set specific terms such as duration, geographic region, and whether the image can be used on merchandise. **App. 1132-1136, 1273-1274** ("license would be between

Shutterstock and a licensee"). Shutterstock receives license payments from clients and is "the only party with control over the photographs it delivers to clients." **App. 898.**

Once Shutterstock receives the license fee for a photograph, it authorizes its licensee to "download [the photograph], and then they have access to the full size." **App. 1110-1112, 1319.** Shutterstock distributes a copy of the licensed photograph to its licensee via a specific download link or URL and the licensee then downloads *another* copy of the photograph and stores that copy on its own system and server for use on websites, books, and merchandise. **App. 1132-1136.**

Shutterstock then pays a royalty to the vendor that supplied the photograph to Shutterstock. **App. 1067.** This provides an incentive to Shutterstock's network of vendors to submit as many high-quality photographs as possible and, as here, encourages widespread infringement. **Id.**

### C. Shutterstock's infringement

Shutterstock sourced one unauthorized copy of each of the 337 McGucken Photographs (collectively, "Infringing Copies") from at least three of its vetted and verified vendors. **App. 1612-1624.** The vendor responsible for submitting 324 of the works to its review portal, Moajjem Hossain a/k/a Hane Street, advised Shutterstock that he was in Bangladesh. **App. 1612.** The Infringing Copies professionally depict numerous U.S. locales. **App. 379-714.**

While the Infringing Copies were in its review portal, Shutterstock reviewed them for metadata, quality, subject matter, aesthetics, commercial appeal, and the other "30-odd rejection reasons" referenced above. **App. 1374-1375, 1294-1296.** Shutterstock approved the photographs, made its own copies, and then stored and displayed those copies – which are identical to the McGucken Photographs aside from minor cropping, rotation or lighting adjustments – in multiple sizes and resolutions on various URLS in its online store. **App. 715-870, 1153-1163, 1229-1238**

Shutterstock then sold 938 licenses for those photographs to its customers, earning at least $2,131.00 in revenues from individual licenses and additional revenues from temporal subscriptions. **App. 1164-1174.** Shutterstock, and not the contributor, entered into the license agreements. **App. 1247.** Once Shutterstock and its client executed the licenses, Shutterstock distributed additional copies of McGucken's photographs to the licensees via download or link. **App. 715-870, 1153-1163.** Shutterstock did not obtain McGucken's consent for these licenses or provide notice of same, despite him being widely credited online as the works' author. **App. 1120.**

Shutterstock, when reviewing the photographs, received CMI in the form of embedded metadata reflecting McGucken's authorship of the works. **App. 1143-1152.** When it made its own additional copies of the Infringing Copies,

8

Shutterstock removed the metadata, added its logo to the copies to claim them as *its own* intellectual property, and added those copies to its public store. **App. 715; 1399, 1482-1485**. When Shutterstock's client paid for a license, Shutterstock provided it a high-resolution copy of McGucken's photograph with McGucken's CMI and Shutterstock's watermark removed. **App. 1110-1112, 1319, 1401**.

### D. Shutterstock's licensees' infringement

After receiving copies of McGucken's photographs from Shutterstock, Shutterstock's licensees made and stored *additional* unauthorized copie*s* on *their own* servers and thereafter exploited *additional* copies on books, websites, and other merchandise, reaping profits from each infringing copy of McGucken's photography. **App. 1164-1206**.

Shutterstock did not notify its licensees of McGucken's infringement claims until on or around June 2022, at least *four months* after this action was filed. **App. 1207-1208**. And it failed to mention McGucken's ownership in the belated notices to its licensees. **Id.** Numerous Shutterstock licensees continue to infringe McGucken's copyrights as of the filing of this brief. See *McGucken v Lonely Planet USA, LLC*, 1:23-cv-04293-ALC-SLC (S.D.N.Y.)(Shutterstock licensee continues to sell books incorporating McGucken photograph with a Shutterstock credit).

Shutterstock also entered into agreements with, and distributed McGucken's photographs to, third-party partner advertisers, including TinEye, HelloRF (which Shutterstock owns in part), and StockFresh. **App. 1207-1218.** Shutterstock provides these partner sites access to Shutterstock's curated photography portfolio and directs them to display the photography on their sites, advertise Shutterstock licenses, and direct viewers to purchase licenses at Shutterstock's online store. **App. 1207-1218, 1380, 1384.**

Shutterstock provided its partner sites, or "resellers," with Shutterstock computer code (their Application Programming Interface, or "API") that allowed the partners to display and distribute McGucken's photographs, and directed each "authorized reseller" to further display the photographs on each of their sites to encourage viewers to visit Shutterstock's site to purchase licenses for the McGucken Photographs. **App. 1383-1386, 1175-1206**. The broad distribution of its photography via these partner sites is vital to Shutterstock's business. **App. 897, 1425-1426**.

 Shutterstock's API terms require its partners to "incorporate the Shutterstock watermark" when displaying Shutterstock's photography and include a statement that each photograph is "Powered by Shutterstock." **App. 1207-1228.** StockFresh, TinEye, and HelloRF participated in this program and displayed McGucken's photographs alongside Shutterstock branding and advertising. **Id.**

10

Shutterstock used the Infringing Copies to advertise its 15% discount sale on the TinEye and StockFresh websites. **App. 1207-1217, 1381** Because TinEye and StockFresh used Shutterstock's code and API, they displayed Shutterstock photographs for as long as the photographs were available on Shutterstock's server. **App. 1380-1381**.

### E. Shutterstock's reckless conduct

Shutterstock accessed McGucken's CMI identifying him as the owner of the McGucken Photographs' copyrights when it approved the use of his work in its online store and thus knew or should have known he owned the work. **App. 1143-1152**. Shutterstock also learned that its Hane Street contributor, who supplied most of the initial Infringing Copies, was an infringer as early as March 2020, when it was sued for infringement in *Itasca Images, LLC et al v. Shutterstock, Inc., et al*, 0-21-cv-00287 (D.MN 2021). **App. 1137-1142**. McGucken also notified Shutterstock of its infringement of his rights in December 2020. **App. 1229-1238.** Yet, Shutterstock failed to fully remove McGucken's photographs from its site until May 2022. **App. 1615-1616.** And Shutterstock allowed its licensees to exploit the photographs until at least June 3, 2022. **App. 1207-1208, 1607-1609**. And it continued to exploit the photographs to advertise on TinEye until at least August 2022, on StockFresh until at least July 2022, and on HelloRF until at least September 2022. **App. 1207-1217.**

Shutterstock has been sued for copyright infringement **at least 14** times since 2019. See **Dkt. No. 150-3**. In one pending case, it is alleged to have attempted to "exploit the COVID-19 pandemic to walk away from its contractual obligations" and infringed a publisher's rights in at least 2,300 photographs in doing so. See *Penske Media Corporation v. Shutterstock, Inc.*, 1-20-cv-04583, Dkt. No. 29. Shutterstock concedes that it has "been subject to a variety of third-party infringement claims in the past and will likely be subject to similar claims in the future[,]" and that it "cannot assure you that we are not infringing or violating any third-party intellectual property rights." **App. 923**.

## IV.  STANDARD OF REVIEW

This Circuit "review[s] a district court's grant of summary judgment de novo where the parties filed cross-motions for summary judgment and the district court granted one motion but denied the other." *Jing v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 56 (2d Cir. 2021), quoting *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568, 576-77 (2d Cir. 2019). In so acting, it must construe the "evidence in the light most favorable to the party against whom summary judgment was granted" and draw "all reasonable inferences in that party's favor." *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023)

Summary judgement is only appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

*Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023), citing Fed. R. Civ. P. 56(a). The moving party must establish that "no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## V.     THE DIGITAL MILLENNIAL COPYRIGHT ACT ("DMCA")

The DMCA "seeks to balance the interests of copyright owners and online service providers by promoting cooperation, minimizing copyright infringement, and providing a higher degree of certainty to service providers on the question of copyright infringement." *Capitol Recs., Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 636 (S.D.N.Y. 2011), on reconsideration in part, 2013 WL 1987225 (S.D.N.Y. May 14, 2013) (citation omitted). Toward that goal, the DMCA provides safe harbors (i.e., limitations on remedies), but only to qualifying service providers. Id. The "DMCA's safe harbors, as with all immunities from liability should be **<u>narrowly construed</u>**." Id. (emphasis added), citing *United States v. Texas*, 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993); see also *Fame Publ'g Co. v. Ala. Custom Tape, Inc*., 507 F.2d 667, 670 (5th Cir.1975) (statutes that provide Copyright Act liability exceptions should be strictly and narrowly construed).

The DMCA safe harbor "is an affirmative defense that a defendant may assert" to limit its liability. *Bus. Casual Holdings, LLC v. YouTube, LLC*, 2023 WL 6842449, at *3 (2d Cir. 2023)(citation omitted). Shutterstock thus "undoubtedly bears the burden of raising entitlement to the safe harbor and demonstrating that is has the status of a service provider, as defined, and has taken the steps necessary for eligibility." *Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 94 (2d Cir. 2016).

## VI. ARGUMENT

### A. The §512 safe harbor does not excuse Shutterstock's infringement

When analyzing the Copyright Act, "we follow the text of the statute." *Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*, 142 S.Ct. 941, 946 (2022) (citation omitted). The text establishes the safe harbor is inapplicable.

### 1. The district court erred by concluding that Shutterstock proved that its infringing acts were covered by §512(c)

Shutterstock failed to establish that §512(c) limits its liability for damages for its various acts of infringement. This section states:

> A service provider shall not be liable ... for infringement of copyright by reason of the **storage at the direction of a user** of **material that resides on a system or network controlled or operated by or for the service provider**, if the service provider—

> (A) (i) does not have **actual knowledge** that the material or an activity using the material on the system or network is infringing; (ii) in the absence of such actual knowledge, **is not aware of facts or circumstances from which infringing activity is apparent**; or (iii)

14

upon obtaining such knowledge or awareness, acts **expeditiously** to remove, or disable access to, the material;

(B) does not receive a **financial benefit** directly attributable to the infringing activity, in a case in which the service provider has the **right and ability to control such activity**; and

(C) upon notification of claimed infringement as described in paragraph (3), responds **expeditiously to remove, or disable access to, the material** that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1) (emphasis added).

Shutterstock was required to prove "'beyond controversy **every** essential element'" of the above. *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1052 (9th Cir. 2017). Shutterstock failed do so, and a triable issue exists as to whether: (a) the Infringing Copies were "stored at the direction of the use" in Shutterstock's store; (b) Shutterstock is a "service provider"; (c) Shutterstock had the right to control infringement from which it financially benefited; (d) Shutterstock knew or should have known of the infringement; and (e) Shutterstock moved expeditiously to disable access to the infringing material.

a.      **Shutterstock's infringement did not occur "by reason of the storage at the direction of a user of" infringing material in Shutterstock's online store**

Shutterstock cannot prove, as is required, that its unauthorized reproduction, display, and distribution, of McGucken's photographs, each of which discretely

violated McGucken's exclusive 17 U.S.C. § 106 rights, occurred "by reason of storage" of McGucken's works at the direction of Shutterstock's contributors.

As a threshold matter, McGucken's photographs were not "stored" on Shutterstock's online store "at the direction of the user." See 17 U.S.C. § 512(c). And they certainly were not stored on Shutterstock's licensees' servers, websites, and products because of any Shutterstock user's direction.

Content is stored "at the direction of the user" only when the process through which the content is posted online "is fully automated and operates solely in response to user input without the active involvement of [the website's] employees." *Viacom Int'l, Inc. v. YouTube, Inc*., 676 F.3d 19, 40 (2d Cir. 2012). While acts related to "the storage itself" may fall within the section, that only occurs when they are "narrowly directed toward providing access to material stored at the direction of users[.]" Id., citing *UMG Recordings, Inc. v. Veoh Networks, Inc*., 620 F.Supp.2d 1081, 1092 (C.D. Cal. 2008). Conversely, "[m]aterial stored" on a site's system "through the intentional activity of" the site or "its own acts or decisions…does not fall within [§512(c)]." *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc*., 2011 WL 1598916, at *16 (C.D. Cal. 2011), aff'd, 730 F.3d 1060 (9th Cir. 2013), and aff'd, 745 F.3d 343 (9th Cir. 2014), quoting H.R.Rep. No. 105–551(II) at 53 (1998). Shutterstock's own acts and decisions resulted in copies of McGucken's photographs being created and

16

added to Shutterstock's store and then licensed to and stored by Shutterstock customers. The safe harbor is thus inapplicable.

### i. Shutterstock decided to include McGucken's photographs in its online store

Shutterstock's employees approved McGucken's photographs and acted to add them to Shutterstock's store. These acts were not "automatic" or "solely in response to user input." When a site "chooses what material it will make available for download" or "purchase," that material is not "stored at the direction of the user" and §512 is inapplicable. *Rock River Communi'ns, Inc.*, 2011 WL 1598916, at *16. Shutterstock does exactly that.

Crucially, "storage" as used in the statute encompasses only "the access-facilitating processes" through which the public can view the content. *Mavrix Photographs, LLC*, 873 F.3d at 1052., citing, *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1016 (9th Cir. 2013). It is thus error to "focus[] on the users' submission of infringing photographs" because the focus should be on the site's "screening and public posting of the photographs." *Id.* at 1053. It follows that whether the infringement occurred by reason of storage at the direction of the user turns not on Shutterstock's receipt of users' material, but rather on Shutterstock's "role in making material stored by a user publicly accessible on its site." Id.

17

Shutterstock played the *exclusive* role in making the Infringing Copies accessible, reviewing and approving each of the Infringing Copies for substance and quality before making copies therefrom to add to its online store. Shutterstock concedes (and even promotes) its gatekeeping role, stating "Shutterstock has high standards and only accepts a portion of the images to be included in our collection." **App. 1071.** And no photograph will be moved from Shutterstock's private review portal to its online store "unless and until" it has been approved by its "specialized team of reviewers"—and sometimes a secondary team of review coordinators—for "Focus, Noise, Exposure**,** Color Profiles and Vectors," and more. **App. 1243, 1305-1307, 1309-1310, 1315**.

McGucken's 337 photographs each went through Shutterstock's employees' review and approval process before Shutterstock added them to its online store: "unless and until a Shutterstock reviewer approves a particular photograph, it will not appear on the Shutterstock website or be available for license." **App. 1305-1307.** "Shutterstock's reviewer team reviewed and approved" McGucken's photographs before they were added to its online store, so their inclusion was not user-directed. **App. 1374-1375.** When "an individual employee reviews every image […] [t]his human touch suggests that [the website's] transmission of images to its vendors may not be truly "automatic." *Sid Avery & Assocs., Inc. v. Pixels.com, LLC*, 479 F. Supp. 3d 859, 866 (C.D. Cal. 2020) (citation omitted).

Because Shutterstock alone decides what photographs to include in its online store, and acted to include McGucken's photographs, there is a triable issue as to whether Shutterstock's infringement occurred "by reason of storage at the direction of a user" as required by §512(c).

**ii.     Shutterstock itself made and distributed unauthorized copies of the McGucken Photographs**

A copy cannot be stored at the "direction of a user" if the infringer makes the copy itself, so if additional copies of a work are made by the infringer, it must prove that they were made "solely to facilitate access by users." *BWP Media USA Inc. v. Polyvore, Inc*., 922 F.3d 42, 58 (2d Cir. 2019). This dooms Shutterstock's safe harbor claim because Shutterstock made *numerous* copies of McGucken's photographs to facilitate its own licensing of the works and then provided download links to its licensees for them to create *additional* copies that were saved on the licensees' servers.

The *Polyvore* court found that the safe harbor would likely be inapplicable if the infringer made multiple copies of a work and then assigned each copy a unique URL "that could be viewed by anyone at any time." *Polyvore,* 922 F.3d at 59 (Walker, J., concurring) (reversing safe harbor finding because copies were potentially made for purposes other than facilitating access).

19

Here, after the Shutterstock contributors submitted a single copy of each of the 337 McGucken Photographs, Shutterstock made multiple copies of each of the works in multiple sizes and formats: "a certain number [were] immediately made" while "certain actions need to happen" for others to be created, after which Shutterstock assigned each at least two unique URLs to the copies and added them to its online store. **App. 1137, 1153, 1318**.

Like in *Polyvore*, there is at least "a question of material fact" as to whether Shutterstock's "additional copies were made solely to facilitate access by users." Id., 922 F.3d at 58. And Shutterstock, "as the party with the burden to prove its affirmative defense, has not pointed to evidence in the record that shows, assuming these copies were made, why they were made at all." Id.*, 922 F.3d at 58 (internal citation omitted). Shutterstock has thus failed to carry its burden of establishing that the copies it made were to "render" user-uploaded content "viewable over the Internet to most users." Id., citing *Viacom*, 676 F.3d at 39. It could not do so because Shutterstock made the copies to market and distribute McGucken's photographs to its clients. This alone is sufficient to create a triable issue.

The district court erroneously concluded that "Shutterstock's system automatically creates multiple small-sized, low-resolution copies (i.e., thumbnails) of every contributor-supplied image posted to its website for license so that the potential customer can get a sense of how the image might look." *McGucken*, 2023

20

WL 6390530, at *8. First, this finding is factually inaccurate. As described above, human reviewers, and not a "system," approves the creation of and then acts to create the copies. And while some of Shutterstock's copies may be smaller in scale, most are *not* thumbnails, and the main store copy of the photograph is a *full-size*, high-resolution copy. **App.1153**. In addition, Shutterstock creates another "full resolution, watermark-free image…*after* a license has been purchased." See **App. 1401** (emphasis added), **1318-1319**. Because multiple copies were not simply searchable thumbnails, there is at least a triable issue as to whether Shutterstock's creation of these copies were each made merely to facilitate access on its webstore.

As a second discrete ground, Shutterstock selected the McGucken Photographs and directly entered into 938 licenses that required Shutterstock to deliver copies of those photographs to third parties. This precludes the safe harbor protections because "business transactions do not occur at the [']direction of a user['] within the meaning of § 512(c)(1) when they involve the "manual selection of copyrighted material for licensing to a third party." *Viacom*, 676 F.3d at 40 (reversing a finding that the safe harbor applied to third-party licensing). These 938 licenses were not "at the direction of the user" as "any license would be between Shutterstock and a licensee." **App. 1275.** This also precludes the safe harbor.

Also, the copies that Shutterstock distributed to licensees were not "stored at the direction of" the Shutterstock contributor and they were not created "solely to

facilitate access by users." *Polyvore,* 922 F.3d at 58. To the contrary, these copies were placed on licensees' servers, websites, books, and products and had nothing to do with access to Shutterstock's site.

Finally, Shutterstock's syndication of the McGucken Photographs to its third-party partners did not occur "by reason of storage at the direction of the user." *Viacom,* 676 F.3d at 40 (YouTube's syndication of works on its platform to third parties was not necessarily within the safe harbor). Shutterstock, and not its users, syndicated the McGucken Photographs via its API to third-party partners like TinEye for further display (and infringement). **App. 1207-1218**.

In sum, the safe harbor is inapplicable because Shutterstock made additional unauthorized copies, distributed those copies to its licensees (who then made additional copies to store on their servers), and syndicated additional copies to its third-party advertising partners.

### b.   Shutterstock's infringement was not "by reason of" the storage of McGucken's photographs in its store

Even if the McGucken Photographs were stored in Shutterstock's store by reason of its contributors, the safe harbor is still unavailable because the safe harbor would cover at most, Shutterstock's "display" of those photographs. Shutterstock's other, separate acts of infringement – its reproduction, distribution, and creation of derivatives from McGucken's photographs – were not "by reason

of" this storage and would thus be outside the safe harbor's ambit. See 17 U.S.C. §106 (enumerating author's exclusive rights); 17 U.S.C. § 512(c)(safe harbor applies only to infringement "by reason of the storage at the direction of a user"). The phrase "by reason of is typically wordy for *because of*." Garner, Bryan, *Garner's Dictionary of Legal Usage*, 3rd ed., pg. 128, Oxford University Press, 2011. (emphasis in original; citation omitted).

Shutterstock infringed McGucken's copyrights every time it violated one of his exclusive §106 rights,[1] including by: (a) "licens[ing] McGucken's photographs approximately 930 times" (**App. 1374-1375)**, and distributing same to "authorized resellers" (**App. 1207-1218, 1384)**; (b) reproducing and modifying the McGucken Photographs to create different sizes and formats (**App. 715, 1153-1163)**; (c) providing tools to its customers to modify the McGucken Photographs (**App. 896, 1328)**; and (d) adding its watermarks to McGucken's photographs to create derivative works (**App. 1220)**. None of these acts were "because of" the contributor's upload of the Infringing Copies and each discretely violated McGucken's 17 U.S.C. §106 rights. They are outside §512's ambit.

---

[1] "Copying" is "shorthand for the infringing of any of the copyright owner's five exclusive rights" described in § 106." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010)(citation and internal quotation marks omitted).

### i. Shutterstock's infringing distribution of McGucken's photographs to its licensees and advertising partners is not covered by §512

The safe harbor does not excuse Shutterstock's infringing distribution of 938 copies of McGucken's photographs to its licensees and further distribution to its advertising partners because that infringement did not occur "by reason of the storage" of the user.

An artist has the exclusive right to "distribute copies" of their "copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, 2021 WL 5359671, at *19 (D. Md. 2021), quoting 17 U.S.C. § 106(3). A "distribution" occurs when a work is publicly disseminated. Id. (citation omitted). Making "unauthorized copies and publicly sharing them through" a website "directly infringe[s]" the "rights of reproduction and distribution[.]" *Capitol Recs., LLC v. Escape Media Grp., Inc.*, 2015 WL 1402049, at *41 (S.D.N.Y. 2015).

Shutterstock distributed unauthorized copies of McGucken's photographs to each of its 938 licensees via specific download links that authorized the licensees to make additional copies to store on their servers (and then display on their sites and products). **App.1318-1319.** These distributions, which violate McGucken's §106(3) right to "distribute copies" of his work, cannot be covered by the safe

24

harbor, which pertains only to infringement resulting from "materials stored at the direction of users," and not to the service provider's "intentional activity." *Rock River Communi'ns, Inc.,* 2011 WL 1598916, at *16. Shutterstock's distribution of these photographs was not user-directed and were "intentional acts" that are outside the safe harbor.

Even if Shutterstock's *display* of McGucken's photographs falls within the safe harbor, its *distribution* of said photographs to its licensees and advertising partners would not. "Distribution of a work is distinct from "displaying" that work." *Brittney Gobble Photography, LLC,* 2021 WL 5359671, at *19, citing *Advance Magazine Publishers, Inc. v. Leach*, 466 F. Supp. 2d 628, 637 (D. Md. 2006). By "making available unauthorized copies of [his] publications, [Shutterstock] has infringed [McGucken's] right to distribution." *Advance Magazine Publishers, Inc.,* 466 F. Supp. 2d at 638. Shutterstock's distribution of 938 licenses for McGucken's photographs to its customers violated McGucken's exclusive distribution right and is not covered by the safe harbor because that distribution did not occur "by reason of storage at the direction of the user."

## ii.  Shutterstock's reproduction of McGucken's photographs and creation of derivatives therefrom is not covered by §512

Even where §512 insulates a site for the initial upload by a site's user, it does not excuse that site's "reproductions" of that first copy to make additional

copies. 17 U.S.C. §106(1) (artist has exclusive right to "reproduce the copyrighted work in copies"). Yet Shutterstock unlawfully reproduced the copies of McGucken's works contributed by its users and hosted them at different URLs and in different forms, including a full-resolution copy, thumbnails, and "asset detail pages" for each photograph. **App. 1317-1318, 1435.** Shutterstock maintains the "asset detail page" for a photograph even after removing the work from its online store. **App. 1449-1450**. And it creates additional high-resolution reproductions, with its name and logo removed, to distribute to its licensees after it sells them a license. **App. 1318-1319**. Each of these reproductions was a copyright violation that did not occur by reason of user storage.

Moreover, Shutterstock's addition of its name and logo to McGucken's photographs violated his derivative right under 17 U.S.C. 106(2).[2] Section 101 of the Copyright Act defines a "derivative work" as one that is based on "preexisting works." *Weissmann v. Freeman*, 868 F.2d 1313, 1321 (2d Cir. 1989). Shutterstock watermarked McGucken's photographs with its name and logos, creating an unlawful derivative work that violated McGucken's §106(2) right.

Shutterstock also induced others to create infringing derivatives of McGucken's photographs. Creating "a cropped photograph of an earlier

---

[2] This violation is discrete from the §1202 violation discussed, *infra*.

photograph is a derivative work," as is making "some alteration of the expressive element" of the original. *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 306 (S.D.N.Y. 2000). Shutterstock's "Editor" tool enables its customers to, crop, alter coloration and other expressive elements, and otherwise modify the photographs in its store. **App. 896, 1328**. Each modified copy of McGucken's Photographs is an infringement of his derivative work right resulting from Shutterstock's provision of the Editor tool, not user storage.

The safe harbor is inapplicable to the above acts of infringement.

### c.     Shutterstock's infringement includes material residing on third-party systems

The safe harbor only applies to infringement by reason of "material that resides on a system or network controlled or operated by or for the service provider[.]" 17 U.S.C. § 512. Thus, the safe harbor doesn't cover Shutterstock's licensee's infringing copies because those copies "reside on a system or network" controlled by a third party – the licensee. These licensees then reproduced the McGucken Photographs on their own websites, incorporated them into packaging for major retail products sold on Amazon and at Walmart, and printed them in

physical books to be sold worldwide.[3] None of this infringing material "resides" on Shutterstock's system or network.

Shutterstock also distributed copies of McGucken's photographs to other networks and systems controlled by HelloRF, TinEye, and Stockfresh, who then engaged in further copying and distribution of McGucken's work on their own networks. **App. 1207-1218.** The above acts are outside the safe harbor.

### d.      Shutterstock financially benefitted from and had the right and ability to control the infringement

To qualify for the safe harbor, Shutterstock was also required to prove that it did "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity[.]" *UMG Recordings, Inc.*, 718 F.3d at 1026, quoting 17 U.S.C. § 512(c)(1)(B). It did not do so.

### i.      Shutterstock financially benefited from the infringement

The financial benefit "need not be substantial or a large proportion of the service provider's revenue." *Mavrix Photographs, LLC*, 873 F.3d at 1059, citing *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004). It "exists where the

---

[3] Indeed, McGucken was forced to file suit against a Shutterstock licensee who confirmed that it stored his work on its system and reproduced it both online and in a physical book and has not ceased its infringement. See *McGucken v. Lonely Planet USA, LLC*, 1:23-cv-04293-ALC-SLC (S.D.N.Y.).

availability of infringing material acts as a draw for customers." *Bodyguard Prods., Inc. v. RCN Telecom Servs., LLC*, 2022 WL 6750322, at *10 (D.N.J. 2022), quoting *Parker v. Google, Inc.*, 242 F. App'x 833, 837 (3d Cir. 2007).

Shutterstock financially benefitted from McGucken's photographs both through direct sales and by drawing customers to its platform. The evidence shows that Shutterstock directly profited from 938 license sales for McGucken's photographs, receiving at least $2,131.00 from the transactions, and received additional subscription revenues. **App. 1164-1174, 1374-1375.** And Shutterstock profited from the infringement by contracting with "third party providers" like TinEye and by reproducing McGucken's photographs "in an effort to draw customers" to its site. *Venus Fashions, Inc. v. ContextLogic, Inc*., 2017 WL 2901695, at *28 (M.D. Fla. 2017), citing *Columbia Pictures Inds., Inc. v. Fung*, 710 F.3d 1020, 1045 (9th Cir. 2013); **App. 1244, 1209-1220.** Because Shutterstock made direct sales and exploited the works to draw consumers, specifically trumpeting the quality of its photography portfolio, there is at least a triable issue as to Shutterstock's financial benefit.

### ii. Shutterstock had the right and ability to control the infringing activity

An infringer has the "right and ability to control infringing activity" where it advises "its users what to upload" or "curate[s] uploaded content in any

meaningful way[.]" *Kinsley v. Udemy, Inc.*, 2021 WL 1222489, at *4 (N.D. Cal. 2021), quoting *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 613 (9th Cir. 2018). This kind of right and ability to control can "take the form of prescreening content, rendering extensive advice to users regarding content and editing user content[.]" *Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 118 (S.D.N.Y. 2013)(quotation omitted).

Shutterstock prescreened the Infringing Copies for content, substance, and marketability, as it does every photograph that it includes in its online store. This review by Shutterstock's "specialized team" of reviewers encompasses stylistic and aesthetic concerns such as lighting, composition, blurriness, and framing. **App. 897, 1068-1089, 1294-1295**. Shutterstock also provides *extensive* advice to its contributors, including in the form of "contributor success guides" and instructional blogs that train contributors to meet Shutterstock's "high standards." **App. 1068-1089.** And Shutterstock has the "unfettered ability to control access to" the photographs on its site, which amounts to "total dominion" over its content. *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009)(citation omitted).

Shutterstock also controls the infringing activity because it is the sole party able to sell licenses to its clients. Courts consistently find a right and ability to control where an infringer directly licensed photographs to clients. In *Michael*

*Grecco v. Prods., Inc. v. Alamy*, the court found that Alamy likely did not qualify for the §512(c) safe harbor because Alamy, "rather than a user of the Alamy website, displayed the [plaintiff's] photograph and offered copies for prospective license." 372 F. Supp. 3d 131, 140 (E.D.N.Y. 2019). So true here.

Likewise, the *Greg Young Pub., Inc. v Zazzle, Inc.* court found that an online seller could control infringing activity because "[defendant]'s role [was] not limited to facilitating the sale of products owned and marketed by third parties" but rather directly sold those products to customers itself. 2017 WL 2729584 at *8 (C.D. Cal. 2017). It thus found as a matter of law that the infringer was "not protected under § 512(c) to the extent it manufactured and sold physical products bearing infringing images." Id.

Similarly, here, Shutterstock directly sells the licenses, makes the infringing copies, and distributes them to its clients. It does not facilitate license agreements between its users and third parties but instead *directly* enters into the agreements. Shutterstock concedes that it is "the principal in the transaction" and is "responsible for the performance obligation" and controls the content "before transferring it to the customer." **App. 898** (10-K filing). Shutterstock further controls the infringement through "kill notices" that it sends to its licensees that are infringing because of Shutterstock licenses. **App. 1607-1609.**

Shutterstock's active prescreening of content, first-party transactions, and sole ability to control its store's content distinguishes it from other infringers found to lack a "right and ability to control." In *Capitol Recs.*, this Court found that "Vimeo staff do not watch or prescreen videos before they are made available on the website." 826 F.3d at 84. And likewise, in *Polyvore*, that its "employees did not review or interact with user posted image before they appeared on the site." 922 F.3d at 45. And neither Vimeo, YouTube, nor MP3Tunes controlled the distribution of their copyright material to users through direct sale or licensing; they instead automatically and instantly made user-submitted content publicly accessible to viewers.

Shutterstock, unlike these other sites, also vets *who* can submit content to their platform. Any user of MP3Tunes and Polyvore could visit their platforms and immediately upload content that the public could view. *EMI Christian Music Grp.*, *v. MP3Tunes, LLC*, 844F.3d 79, 86 (2d Cir. 2016); *Polyvore*, 922 F.3d at 44-45. And Vimeo and YouTube only require basic registration that involves no review. *Capital Recs.*, 826 F.3d at 85; *Viacom*, 676 F.3d at 28. In contrast, Shutterstock requires individuals to "submit an application that includes a portfolio of images or videos" for Shutterstock's review, and at one time "of the 335,000 contributor accounts that [had] been created, only 35,000 contributors [had] been approved." **App. 993.** This is control.

The district court's analysis of the "right to control" was undeveloped. It held, as "in *Steinmetz*, "[t]he undisputed facts show that Defendant had no right to control the initial infringing conduct by the Contributor[s]. Defendant did not invite or request the Contributor[s] to upload." [citation] And while images are subject to review by Shutterstock before they are ingested into the platform, "Defendant cannot be precluded from safe harbor simply because it failed to reject [an] image when initially uploaded." *McGucken*, 2023 WL 6390530, at *10, quoting *Steinmetz v. Shutterstock, Inc.*, 629 F. Supp. 3d 74, 85 (S.D.N.Y. 2022).

This analysis fails for numerous reasons. First, while the court can rely on legal findings from the *Steinmetz* case, it cannot rely on factual findings. The decision cites *no* evidence that would establish Shutterstock carried its burden to prove it lacked control of its content. And it fails to address McGucken's evidence of such control, including Shutterstock's own statements that every image must be "approved by a reviewer" and that "unless and until a Shutterstock reviewer approves a particular photograph, it will not appear on the Shutterstock website or be available for licensing." **App. 1305-1307**. Or McGucken's evidence that Shutterstock solicits contributions through its "marketing department" and vets its contributors and provides "referral fee[s]" for recruiting others. **App. 1281.**

Shutterstock extensively advises its contributors on what content to provide through its contributor success guides, instructional posts, and even feedback on

how to better submit when images are rejected. **App. 1070-1089.** And

Shutterstock's review goes far beyond "failing to reject an image," to include

manual review for "quality of the image," marketability, and technical standards,

among "30-odd rejection reasons" before approval. **App. 1294-1296.** And the

district court did not address Shutterstock's direct licensing of McGucken's work,

which were infringing acts that did not involve the contributors at all. **App. 897,**

**1247**. The district court overlooked critical evidence establishing a triable issue as

to Shutterstock's right and ability to control infringement, requiring reversal.

> **e.** **Shutterstock failed to prove it was unaware of the infringement**
> **and acted expeditiously to remove the infringing content**

Shutterstock failed to establish that it lacked awareness of the infringement

or acted expeditiously to remove or disable access to the material. The statute

requires a site to prove it did "not have actual knowledge" of infringement and that

it was "not aware of facts or circumstances from which infringing activity is

apparent." 17 U.S.C. § 512(c)(A)(i-ii). Specific knowledge of the infringing

activity is unnecessary, "red flag knowledge" is sufficient, and it need not arise

from formal DMCA notices, but may also arise from "other means." *UMG*

*Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1107 (C.D. Cal.

2009). "Red flag" knowledge also stems from "proceed[ing] in the face of blatant

factors of which it was aware." *Ventura Content, Ltd.*, 2013 WL 11237204, at *6
(C.D. Cal. 2013), aff'd, 885 F.3d 597 (9th Cir. 2018)(citations omitted).

Shutterstock had both actual and "red flag" knowledge of the infringement.
McGucken provided Shutterstock notice that "Hane Street" had contributed
unauthorized copies of his work. **App. 1229-1238**. At that time, Shutterstock
*already* knew that Hane Street was a serial contributor of infringing content
because in March 2, 2020, it was sued by *another* artist for copyright infringement
related to Hane Street's photographs. **App. 1137-1142**.

Shutterstock also reviewed the metadata in the Hane Street photographs that
identified McGucken as the author, as the CMI attributed the works to "ELLIOT
MCGUCKEN" and "45EPIC" and "45SURF," which are McGucken's brand and
personal names. **App. 1143-1152.**

And if the photographs had lacked said metadata, the absence of this
indicium of ownership would have provided "red flag" knowledge that the material
was infringing. See H.R. REP. NO. 105-551, pt. 1, at 25 (1998)(red flags include
"the absence of customary indicia of ownership or authorization, such as […]
copyright management information").

Shutterstock certainly knew of the infringement as of the date the action was
filed, but it continued to infringe. The safe harbor for "an innocent service provider
disappears [...] at the moment it becomes aware that a third party is using its

system to infringe." *Disney Enters., Inc. v. Hotfile Corp.*, 2013 WL 6336286, at

*26 (S.D.Fla., 2013) (internal quotation marks and citations omitted). Here,

Shutterstock knew that Hane Street was using its system to infringe after it

received not one but *two* federal lawsuits providing notice that Hane Street was

infringing. Yet it, its licensees and API partners continued to exploit the

McGucken Photographs on multiple pages for at least three months after this

action was filed. **App. 1612-1624.** Shutterstock also failed to terminate the 938

licenses—or even advise the licensees of the issue—for at least *four months* after

this action provided notice of infringement. **App. 1208, 1608-1609**.

 Numerous courts have held that a failure to remove infringing content

anywhere from *18 to 23 days* after notice "cannot be considered expeditious."

*Feingold v. RageOn, Inc.*, 472 F. Supp. 3d 94, 102 (S.D.N.Y. 2020) (emphasis

added); see also *Kinsley*, 2021 WL 1222489, at *5, citing *Seide v. Level-(1) Glob.

Sols., LLC*, 2016 WL 4206076, at *5 n.5 (N.D. Ill. 2016) (collecting cases, noting

"response times to remove infringing material from entities' websites or systems

ranging from 5 to 14 days are expeditious.") Shutterstock's failure to fully remove

McGucken's photographs from its own site or its API partners' sites for at least

three months after notice, and its failure to even seek the removal of McGucken's

work from its licensees' sites for at least four months falls well outside such

established ranges. A triable dispute thus exists as to whether Shutterstock acted "expeditiously."

Finally, Shutterstock was at minimum willfully blind because it "consciously avoided knowing about specific repeat infringers using its services, even though the infringement was rampant and obvious." *EMI Christian Music Grp.,* 844 F.3d at 91. Shutterstock was aware that Hane Street was an infringer yet allowed him to submit, and then approved, the 300-plus infringing copies at issue. And even after Hane Street's account was terminated, McGucken continued to find copies of his photographs on Shutterstock's platform and being exploited by Shutterstock's licensees. As such, there is at least a triable issue as to whether Shutterstock was willfully blind to repeat infringers on its platform.

### f.     The district court's analysis creates a split of authority

The creation of a circuit split is "particularly troublesome in the realm of copyright." *Silvers v. Sony Pictures Ent., Inc*., 402 F.3d 881, 890 (9th Cir. 2005) The district court's analysis, though, splits authority by failing to address Shutterstock's role in making the infringing material public and instead focusing on Shutterstock's users' submissions. *McGucken*, 2023 WL 6390530, at *8.

In *Mavrix*, the Ninth Circuit reversed and remanded a grant of summary judgment applying the §512(c) safe harbor "[b]ecause the district court focused on the users' submission of [plaintiff]'s photographs rather than on [defendants] role

in making those photographs publicly accessible." 873 F.3d at 1053. The district court focused on whether Shutterstock sought out submissions from its users rather than on Shutterstock's *exclusive* role in selecting the photographs and adding them to its publicly accessible online store and then distributing them to its customers. See *McGucken*, 2023 WL 6390530, at *8 (noting McGucken's assertion that only Shutterstock can make photography accessible in its store but only analyzing how contributors join Shutterstock and whether Shutterstock's portfolio is "curated.")

Moreover, in *Mavrix*, the court found that infringing content is stored "at the direction of the user only if the service provider played **no role** in making that infringing material accessible on its site or if the service provider carried out only activities that were "narrowly directed" towards "enhancing the accessibility of the posts." 873 F.3d. at 1056 (emphasis added), citing *Veoh*, 620 F.Supp.2d at 1092; *Shelter Capital*, 718 F.3d at 1018. That court found a question of fact on whether the works were "stored at the direction of the user" because the infringer's *volunteer* "moderators review the substance of posts" and "only those posts relevant to new and exciting celebrity gossip are approved." *Mavrix Photographs, LLC,* 873 F.3d at 1056. Here, it was not unpaid volunteers but paid Shutterstock employees that played a major role by reviewing each and every photograph's content before deciding whether to add them to its online store. It was thus error

for the district court to apply the safe harbor given Shutterstock's failure to show that it played "no role" in making the photographs accessible.

"Other circuits have held that a DMCA safe harbor defense does not apply to 'website owners ... when they are actively involved in the infringement.'" *Roadget Bus. Pte. Ltd. v. PDD Holdings Inc*., 2023 WL 4865005, at *9 (N.D. Ill. 2023), quoting *VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 732 (9th Cir. 2019). Here, Shutterstock's employees reviewed and approved every photograph, made copies, offered them for sale in its webstore, and then distributed them to licensees. These "extensive, manual, and substantive activities" preclude the safe harbor. *Mavrix Photographs, LLC*, 873 F.3d at 1056. The district court found otherwise. A split of authority resulted.

***

Because Shutterstock's infringing acts did not occur by reason of storage of infringing material at the direction of the user and arose from material stored on other systems and networks, the §512(c) safe harbor does not cover Shutterstock's infringement. Reversal is thus appropriate.

## 2.    Shutterstock is not a "service provider"

 Calling "one's business a [']platform['] is not a magic wand." *Sid Avery*, 479 F. Supp. 3d at 869. Shutterstock attempts as much to exploit the safe harbor, but it is not a "a provider of online services or network access, or the operator of

facilities therefor." 17 U.S.C. § 512(k)(1). The safe harbor is thus inapplicable for this reason alone because only "service providers" can access the safe harbor.

An infringer is not a "service provider" simply by virtue of operating online. Congress specifically elected to "enumerate certain activities that benefit from the safe harbors," and "determined that not all online activities were intended to fall within the purview of section 512." U.S. Copyright Office, *Section 512 of Title 17: A Report of the Register of Copyrights*, at 84-85 (May 2020) ("Register Report"). Selling photography licenses is not within that purview.

Indeed, "an entity that is directly licensing copyrighted material online is not a [']service provider.[']" *Agence France Presse v. Morel*,[4] 934 F. Supp. 2d 547, 566 (S.D.N.Y. 2013), citing *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) (in interpreting statutes, courts should look to the whole law, and its object and policy). The enumerated safe harbors are for "transitory digital network communications," "system caching," "information location tools" such as search engines, and "information residing on systems or networks at [the] direction of users," such as where a provider supplies server space for the online storage of materials by its users. Id., quoting 17 U.S.C. §

---

[4] This case was recently cited, for other reasons, with approval by the Second Circuit. See *JLM Couture, Inc. v. Gutman*, 2024 WL 172609, at *7, fn. 2 (2d Cir. 2024).

512(a)-(d); *see also Recording Indus. Ass'n of Am. v. Univ. of N.C. at Chapel Hill*, 367 F.Supp.2d 945, 948–49 (M.D.N.C.2005) (summarizing the OCILLA safe harbors); MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §§ 12B.02–12B.05 (2012). Unlike the above services, "licensing copyrighted material online more closely resembles the mere sale of goods (albeit, in this case, intellectual property) than facilitating users' activities online." *Agence France Presse,* 934 F. Supp. 2d at 566. The safe harbor was thus found unavailable for Getty Images, a Shutterstock competitor, because "their employees were actively involved in the licensing of the Photos–at–Issue[,]" so it was not a "passive host or online facilitator of access to [plaintiff's] images, but rather a licensor of its own rights." Id*.,* 934 F. Supp. 2d at 568.

Shutterstock is similarly situated – it is licensing the photographs, not passively hosting them. When a website, rather than a user of the website, "offered copies for prospective license[,]" the safe harbor is inapplicable. *Grecco,*[5] 372 F. Supp. 3d at 140, citing *Agence France Presse,* 934 F.Supp.2d at 566 ("entity that is directly licensing copyrighted material online is not a 'service provider.'"), reconsidered on other grounds by *Agence France Presse v. Morel*, 934 F.Supp.2d

---

[5] Alamy is also a competitor to Shutterstock and has a very similar business model. Thus, Alamy and Getty Images, Shutterstock's two primary competitors, have *both* been found ineligible for the safe harbor.

584 (S.D.N.Y. 2013); *E. Broad. Am. Corp. v. Universal Video, Inc.*, 2006 WL 767871, at *2 (E.D.N.Y. 2006) (denying motion to dismiss where alleged infringer exceeded the duration of a previously-granted license).

In *Gardner v. CaféPress, Inc.*, an infringer was found not to be "a service provider as a matter of law" because their online store went "beyond facilitating the sale of products between internet users by *directly selling products* to online shoppers" and paying contributors a "royalty or commission for the sale of their products[.]" 2014 WL 794216, at *5 (S.D. Cal. 2014) (emphasis added).

So true here. Shutterstock does not provide a service facilitating sales between internet users, but rather operates a store directly selling licenses to its customers. The Shutterstock contributor is not involved beyond receiving a fee after the transaction. **App. 1247, 1273-1275**. And, notably, one can only become a contributor after approval via Shutterstock's vetting process. Thus, just like the defendants in *Grecco*, *Morel*, and *Gardner*, Shutterstock is not a "service provider."

Significantly, this Circuit has never held that a direct licensor of copyrighted material falls within the safe harbor. Previous defendants invoking §512 like YouTube or Vimeo simply provided a platform for which users submitted content that could be instantly viewed or accessed with the service provider's only involvement being providing the platform itself, like an online gallery of content.

42

In contrast, Shutterstock "function[s] primarily as a store, a commercial destination within the Internet. Just as a merchant might re-package and sell merchandise from a wholesaler, so did [Shutterstock] re-package…and sell images it obtained from the various" contributors. *Playboy Enterprises, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 552 (N.D. Tex. 1997), aff'd, 168 F.3d 486 (5th Cir. 1999).

The district court erred by finding that Shutterstock is a service provider because it "operat[es] ... facilities […] that allow[ ] independent contributors to connect with and make their images available for licensing to users in need of content[.]" *McGucken*, 2023 WL 6390530, at *5, citing *Steinmetz*, 629 F. Supp. 3d at 81 (remaining citations omitted). As shown above, the contributor *never* connects with the licensees and *only* Shutterstock can make the images available for licensing and license same. Shutterstock is not a service provider.

### 3.     Shutterstock does not satisfy §512(i)

In addition to the above, to qualify for the safe harbor Shutterstock must show that it "adopted and reasonably implemented" a repeat-infringer termination policy and that it "accommodates and does not interfere with standard technical measures." *Viacom*, 676 F.3d at 27; 17 U.S.C. § 512(i). Shutterstock failed to prove either, requiring reversal.

### a.     Shutterstock did not adopt and reasonably implement a repeat infringer policy

43

A service provider must "reasonably implement" a termination policy, and "not just adopt one." *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 755 (W.D. Tex. 2019), citing 17 U.S.C. § 512(i)(1)(A). A service provider has *not* "reasonably implemented" such a policy if it "fails to enforce the terms of its policy in any meaningful fashion." *BMG Rights Mgmt. (U.S.) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 303 (4th Cir. 2018).

Shutterstock failed to reasonably implement a qualifying policy. It was aware that its contributor Hane Street was a serial infringer as early as March of 2020, when Shutterstock was sued for selling licenses for Hane Street-submitted photographs. See *Itasca Images, LLC*, 0-21-cv-00287 (D.MN). Despite a federal lawsuit, Shutterstock did not terminate Hane Street's account. To the contrary, Shutterstock continued to accept submissions from Hane Street, including more than 300 unauthorized copies of McGucken's photography. And Shutterstock *still* did not terminate Hane Street's account promptly after receiving McGucken's notice of infringement on January 14, 2021. **App. 1229-1231**. It finally terminated his account at some time in February 2021 and kept many of his infringing photographs online until at least July 2022. **App. 1612-1614, 1213.**

This was unreasonable. A service provider has not reasonably implemented a repeat infringer policy if it fails to "do what it can reasonably be asked to do to prevent the use of its service by repeat infringers." *EMI Christian Music Grp., Inc.,*

844 F.3d at 91, citing *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003). Despite claiming a policy, Shutterstock fails to terminate the accounts of known infringers and is regularly sued for infringement (approximately 14 other infringement lawsuits beyond McGucken's claims). Dkt. No. 150-3.

The district found Shutterstock's late termination of Hane Street a reasonable implementation of a repeat infringer policy because the account was terminated after Hane Street's "second" infringement, but this is misleading. *McGucken* at 6. While Shutterstock terminated Hane Street after the second *lawsuit* filed over his submissions, it did so belatedly and after Hane Street had already committed at least 111 infringements not involving McGucken. Dkt. No. 97-13. A reasonable jury could find that Hane Street was a repeat infringer that Shutterstock failed to terminate. Reversal is warranted.

**b.    Shutterstock failed to accommodate a standard technical measure**

Shutterstock's stripping of McGucken's photographs' metadata precludes the safe harbor. Photographers routinely rely on metadata to ensure that they are properly identified as a work's author and copyright owner.[6] And metadata serves

---

[6] See e.g. Copyright Alliance,  *What Photographers Need to Know About Copyright Law* (https://copyrightalliance.org/education/industry/photographers/) (last visited January 25, 2024)(metadata "puts others on notice of who the copyright owner is"); Format, *Photographer's Guide to Photo Metadata* (April 13, 2021), https://www.format.com/magazine/resources/photography/photo-metadata ("If you publish your work online, the metadata can convey information about

as "copyright management information" under the DMCA. See *Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368, 377–78 (S.D.N.Y. 2019), aff'd, 970 F.3d 167 (2d Cir. 2020).

There is thus a sufficient consensus that metadata is a standard technological measure for protecting photographers' copyrights.[7] So owing, courts recognize that stripping metadata can amount to interference with a standard technical measure. The *Gardner* court rejected summary judgment where the defendant deleted metadata from submitted images because there was at least a triable issue of "whether this use of metadata has been 'developed pursuant to a broad consensus of copyright owners and service providers.'" 2014 WL 794216, at *6.

McGucken included in the McGucken Photographs metadata identifying himself as the author. **App. 788-872.** Shutterstock received the McGucken Photographs and stripped their metadata during its review. **App. 1143-1152, 1482-1486.** There is thus a triable issue as to whether Shutterstock's receipt and removal

---

usage rights and allows you to maintain proof of ownership of your work."); Professional Photographers of America, *Embedding Your Copyright Information in Your Meta data* (lats visited January 25, 2024), https://www.ppa.com/articles/embedding-your-copyright-infor ("Metadata is a collection of information that stays with your image to help identify the image, its owner, and when it was created."); Association of Medical Illustrators, *Metadata – the Key to Protecting Copyright in Digital Imagery*, https://www.ami.org/images/stories/documents/AMI_Metadata_Whitepaper_2016.pdf (June 2016).
[7] **App.1956-1957**.

of McGucken's metadata interfered with this standard protection. **App. 1143-1152**. Reversal is proper.

### 4. Extending the safe harbor to Shutterstock contravenes Congressional intent

When the DMCA was enacted in 1998, the internet had just evolved beyond the "walled gardens" of "AOL and CompuServe." Register Report at 28. Anticipating that the internet's growth would lead to more copyright infringement, Congress enacted §512 to strike a balance between giving service providers "greater certainty about their legal exposure" and "providing rightsowners with reasonable assurance that they would be protected from massive online infringement." Id. at 197.

However, in the nearly 30 years since the DMCA was enacted, massive online enterprises have been built upon the unauthorized exploitation of copyrighted work online, and courts have improperly expanded the DMCA's safe harbor. In 2020, the United States Copyright Office reviewed the statute's application and found that "Congress's intended balance has been tilted askew." Id at 23. Specifically, it found that courts' interpretations of the scope of the safe harbor and who qualifies "either broaden[s] the safe harbors or narrow[s] the safe harbor exclusions, and ultimately alter[s] the balance of the equities as originally weighed by Congress in 1998." Id. at 136.

The result of this skewed balance is illustrated by the instant matter. Shutterstock—a massive for-profit corporation—invoked the safe harbor to limit liability for reproducing, displaying, distributing, creating derivatives of 337 original photographs created by McGucken—an independent photographer—and selling at least 938 licenses for same. Extending the safe harbor to Shutterstock contravenes the statute's intent.

The Copyright Office identified §512(c) as "the biggest source of conflict" in the application of the DMCA. Register Report at 57. Congress contemplated that §512 would protect passive facilitators "providing server space for a user's web site, for a chatroom, or other forum in which material may be posted at the direction of users." Id. The Copyright Office was "unconvinced" that "Congress, in 1998, intended to protect any services…beyond the act of storage or providing access to the content." Register Report at 89-90. Congress, it found, excluded from the safe harbor infringing material that a provider stores on its network through its own actions, drawing distinction between such a site and "one providing server space for a website, chatroom, or other forum for user posts[,]" noting that the "statute makes no mention of related services or of user experience. Id. This section was intended to limit liability for a site that passively stored infringing material that was instantly viewable by the public. Shutterstock does not qualify.

Shutterstock's direct reproduction, licensing, and distribution of McGucken's photographs stands in stark contrast to the chatroom operators §512 was intended to protect. The DMCA's goal was to "to provide copyright owners with "reasonable assurance that they [would] be protected against massive piracy" online. Register Report at 72, citing S. REP. No. 105-190, at 8 (1998). Shutterstock, though, engaged in massive piracy that has resulted in McGucken's work appearing on hundreds of websites and products, with attribution and profits going to Shutterstock and its licensees. See **App. 1175-1206**. The safe harbor was not intended to excuse such conduct.

### 5.   Second Circuit precedent precludes the safe harbor's application

Given the statute's text, and mindful that a safe harbor, "should be narrowly construed,"[8] the Second Circuit has historically limited its application to sites whose users upload infringing material that the site makes publicly accessible immediately and without human review.

In *Viacom Int'l, Inc. v. YouTube*, the Court found that the "safe harbor extends to software functions" that "facilitat[e] access to user-stored material." 676 F.3d at 39. Here, Shutterstock's "specialized team of reviewers" – and not a software algorithm – reviewed and approved the photographs before Shutterstock

---

[8] *Capitol Recs., LLC,* 2015 WL 1402049, at *10 (citations omitted).

copied and added them to its online store. **App. 1243**. And Shutterstock's in-depth approval process, reproduction, licensing, and distribution of the photographs far exceeded "facilitating access" to the photographs. Anyone can upload a video to YouTube without an approval process or human review and it is instantly viewable by the public. Shutterstock's photographs can only be submitted by approved contributors and do not appear in its online store "unless and until" Shutterstock approves their inclusion.

In *Vimeo*, the Court found that videos uploaded by Vimeo employees to its platform, which operates like YouTube, were likely outside the safe harbor, because "a triable issue" existed "with respect to whether the employees were storing their content as 'users'" or "as employees acting within the scope of their employment." 826 F.3d at 86. Here, while Shutterstock's users initially submitted the photographs, it was Shutterstock's employees that reviewed and approved the photographs and then moved them from the review portal to their own public URLs in Shutterstock's online store.

In *EMI Christian Music Grp.*, the Court rejected the §512 safe harbor defense because the copying was directed by the defendant website and not its users. 844 F.3d at 96, fn. 11. Like here, the infringer in that case provided the infringing content to a third-party, who then downloaded the material. Id. at 96 ("the evidence presented at trial showed that each image was actually downloaded several

50

times."). Here, Shutterstock distributed to each licensee a copy of McGucken's photography for downloading. The safe harbor is inapplicable.

### B. Shutterstock violated 17 U.S.C. § 1202

Shutterstock separately violated McGucken's rights under 17 U.S.C. § 1202. The district court further erred in adjudicating these claims in Shutterstock's favor.

### 1. Shutterstock violated 17 U.S.C. § 1202(a)

Section 1202 is intended to protect an artist's right to be credited for their work (and to preclude others from falsely claiming credit). To prove a §1202(a) claim, an artist must show "(1) the provision or distribution of copyright management information ("CMI"); (2) that the CMI was false; (3) that the defendant knew that the CMI was false; and (4) that the Defendant acted with the intent to cause or conceal" infringement. *Penske Media*, 548 F. Supp. 3d at 381.

CMI includes the "name of, and other identifying information about, the author [or] copyright owner of the work." *Mango*, 970 F.3d at 171, quoting 17 U.S.C. 1202(c)(2)-(3). CMI's definition is broad, and corporate names, logos, and watermarks are CMI when they signal the owner or source of an image. See *Aaberg v. Francesca's Collections, Inc.*, 2018 WL 1583037, at *7 (S.D.N.Y. 2018) (collecting cases). A stock image licensor's corporate watermark, name and logo is CMI when displayed in connection with a plaintiff's photographs. *Grecco*, 372 F. Supp. 3d at 138. And we must consider a licensing company's adding its logo to a

51

photograph in an "overall context" to determine whether the plaintiff can show whether the "watermarks constituted false CMI[.]" *Post Univ. v. Course Hero, Inc.*, 2023 WL 5507845, at *5 (D. Conn. 2023), citing *Penske Media*, 548 F. Supp. 3d at 381 (denying motion to dismiss a Section 1202(a) claim when the plaintiff's photos appeared on defendant's website with "Shutterstock" watermarks on them and without an explanation that another company owned the copyright)(citation omitted)(remaining contra citation omitted). Shutterstock added its corporate name and logo to the Infringing Copies, in which it had no rights, before displaying same to the public. **App. 1317, 1399, 1401**. This satisfies the first two elements.

Shutterstock also failed to prove that it lacked the requisite scienter, particularly given that "[q]uestions involving a person's state of mind [...] are generally factual issues inappropriate for resolution by summary judgment." *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1186 (9th Cir. 2016). This requirement can be satisfied by showing that an infringer "placing watermarks on the Copyrighted Works in order to conceal copyright infringement." *Penske Media*, 548 F. Supp. 3d at 382, citing *Grecco*, 372 F. Supp. 3d at 139 ("Defendant acted with knowledge and intent in placing watermarks on the Copyrighted Works in order to conceal copyright infringement."); see also *Mango*, 356 F. Supp. 3d at 378, aff'd, 970 F.3d 167 (the "false attribution to Fisher's law firm would have wrongfully implied that BuzzFeed had permission to use the Photograph, thus

52

concealing its infringement."); *Shihab v. Complex Media, Inc.*, 2022 WL 3544149, at *4 (S.D.N.Y. 2022) (scienter exists when defendant is aware that distributing content with false CMI "will conceal *his own* infringing conduct[.]") (emphasis in original; citation omitted).

Shutterstock's addition of false CMI to McGucken's photographs in the form of its name and logo allowed Shutterstock to conceal that it never had the authority to exploit McGucken's photographs or "to license others to do so" and that "its exploitation of the works is infringing." *Penske Media,* 548 F. Supp. 3d at 382.

Shutterstock reviewed McGucken's CMI. **App. 1143-1152**, **1625-1629.** And despite its indication that McGucken owned the photographs, Shutterstock added its name-and-logo watermark to the Infringing Copies. **App. 715-870**. Even if it could deny knowledge at that time, it could not as of February 2, 2022, when this action was filed. Yet it refused to remove the watermarked Infringing Copies from either its own site or the sites of its licensees and partners at that time.

Shutterstock also displayed false CMI through third parties. The plain text of §1202(a) makes it a violation to either "distribute" or "provide" false CMI, such that a defendant's distribution of false CMI on its own and its provision of false CMI to others are discrete violations of 1202(a). See 17 U.S.C. 1202(a). Indeed, in *Penske Media v. Shutterstock*, Penske's §1202(a) claims withstood challenge

because Shutterstock provided false CMI for "use of the photograph by a third party after Shutterstock had licensed it to them without the authority to do so." 548 F. Supp. 3d at 382.

Here, Shutterstock, without authority, provided false CMI to its third-party API partners and licensees such that they displayed "Shutterstock"-watermarked copies of the McGucken Photographs on their sites along with a Shutterstock credit. **App. 1120**, **1210-1214**. Each provision of false CMI on the McGucken Photographs to a third-party was thus a discrete violation of §1202(a) and there is a triable question as to Shutterstock's liability for same.

The district court held that Shutterstock did not violate §1202(a) because Shutterstock placed its watermark on the McGucken Photographs to identify itself as the "source or distributor of the image, rather than the author or copyright owner," but this is unsupported by evidence or precedent. A licensor's name and watermark on a photograph readily identifies to the public that the stock company owns *or has rights* in the images, which amounts to false CMI. *Grecco*, 372 F. Supp. 3d at 138. And *any* infringer is a source or distributor of the image it is infringing, whether or not they own or have rights to the image, so the district court's finding that there was no violation because Shutterstock identified itself as the source or distributor was error.

54

### 2. Shutterstock violated 17 U.S.C. § 1202(b)

To separately establish a §1202(b) violation, which addresses the removal of CMI, a plaintiff must prove: (1) the "existence of CMI" in connection with a work; (2) the distribution of the work or copies thereof; (3) while knowing that CMI has been removed or altered without authority; and (4) while "knowing or having reasonable grounds to know that such distribution will induce, enable, facilitate or conceal an infringement." *Mango,* 970 F.3d at 171, quoting 17 U.S.C. § 1202(b). An "infringement" for scienter purposes includes the defendant's own alleged infringement. *Shihab*, 2022 WL 3544149, at *5, citing *Mango*, 970 F.3d at 174. Scienter also exists if Shutterstock "distributed [McGucken's] works with the *knowledge* that CMI had been removed, even if [Shutterstock] did not remove" it. *Friedman*, 833 F.3d at 1187 (emphasis in original; citation omitted).

McGucken has satisfied these requirements. McGucken regularly publishes his photography with CMI. **App. 715-873**. And the evidence creates a triable issue as to whether Shutterstock removed this CMI via its stripping process when it approved his work for use in its store. **App. 1143-1152**. If so, McGucken can establish that Shutterstock intentionally removed his CMI from his photographs because "awareness that distributing copyrighted material without proper attribution of CMI will conceal [its] own infringing conduct satisfies the DMCA's second scienter requirement." *Shihab*, 2022 WL 3544149, at *4, citing *Mango*, 970

F.3d at 172.**App. 715-870**. In any event, whether Shutterstock "had knowledge that the CMI had been removed" is a fact "particularly within" Shutterstock's knowledge and "it would be unfair to burden [McGucken] at the summary judgment stage with proving that knowledge" beyond the foregoing. *Friedman*, 833 F.3d at 1189 (reversing summary judgment on the scienter requirement).

A triable issue thus exists, and the district court ruling should be reversed.

## C. The district court erred by failing to rule on two of the three causes of action at issue

Even if the §512 safe harbor applies to Shutterstock's display of McGucken's photographs in its online store, it would not apply to Shutterstock's licensing of McGucken's work to third parties and advertising partners and those parties' distribution of McGucken's work to the public. Despite this, the district court only considered Shutterstock's eligibility for § 512(c) in connection with McGucken's *direct* infringement claim, without addressing McGucken Second Claim for Relief, which stated causes of action for the two types of *secondary* liability—contributory and vicarious. **App.39-40**

Where "a district court fails to rule on a claim," remand is appropriate. *Dualite Sales & Serv., Inc. v. Moran Foods, Inc.*, 194 F. App'x 284, 291 (6th Cir. 2006), citing *Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 552 (6th Cir.2004) (appeals court cannot make factual determinations nor is it possible to review the

court below without some explanation*); Clark v. Chubb Group of Ins. Cos.*, 337 F.3d 687, 694, n. 4 (6th Cir.2003) (remand proper where a district court has not ruled on the issue); *United States v. Richardson*, 437 F.3d 550, 553–54 (6th Cir.2006) (recognizing meaningful appellate review and a district court's obligation to explain to the parties and the reviewing court its reasons for a particular judgment).[9] Here, the district court erred by failing to address the below.

### 1. Shutterstock is vicariously liable for copyright infringement

Vicarious liability for copyright infringement arises when the defendant "profit[ed] from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S. Ct. 2764, 2776, 162 L. Ed. 2d 781 (2005). Liability attaches "even in the absence of actual knowledge[.]" *Viacom*, 676 F.3d at 36 (citation omitted). Vicarious liability is also properly found for a defendant's "failure to police the conduct of the primary infringer." *Gershwin Pub. Corp. v. Columbia Artists*

---

[9] The district court may have overlooked these claims because it adopted, in its entirely, the *Steinmetz* analysis. In *Steinmetz*, however, Shutterstock failed to license Steinmetz's works to any third parties, so the vicarious and contributory claims were not at issue. Here, though, a triable issue exists as to whether Shutterstock is vicariously and contributorily liable for the infringement of each of its 938 licensees. (The *Steinmetz* decision is also problematic because it was issued before briefing was complete—the next business day after the parties filed lengthy oppositions and *before* the parties filed reply briefs.)

*Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). When an infringer is the "the actual seller" of an infringing work and "determine[s] the menu of products" to make "available on the Websites[,]" it is vicariously liable. *Sid Avery*, 479 F. Supp. 3d at 869.

Shutterstock enjoyed a financial benefit from the infringement. Where, as here, the infringer "sold at least one product with one of the six images" and "earned a profit" there is a "causal relationship" between the infringing activity— manufacturing and selling a product—and the financial benefit." *Sid Avery,* 479 F. Supp. 3d at 870. Verily, the financial prong is satisfied when the site collects payment for the infringing sales. *Capitol Recs., LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 660 (S.D.N.Y. 2013), aff'd, 910 F.3d 649 (2d Cir. 2018)(citation omitted), citing, e.g., *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308 (2d Cir.1963) (finding direct financial benefit where the defendant received a share of the gross receipts on every infringing sale). An "obvious and direct financial interest" also exists where "infringing material acts as a 'draw' to attract subscribers to a defendant's business, even if it is not the primary, or even a significant draw." *EMI Christian Music Grp., Inc.,* 844 F.3d at 99.

Here, Shutterstock sold 938 licenses to third parties who were required to promote Shutterstock through a (false) photo credit as part of the terms of the license. **App. 1120.** And Shutterstock distributed the McGucken Photographs to its

third party "authorized resellers" for further display and distribution, including in advertisements for Shutterstock. **App. 1383-1386**. Shutterstock thus had a financial interest due to its sales of licenses for the photographs and their use to advertise to and draw customers.

Shutterstock also declined "to exercise a right to stop or limit" the infringement. *Metro-Goldwyn-Mayer Studios, Inc.,* 545 U.S. at 930, 125 S. Ct. at 2776. A website has this right when it "exercises complete control over its website's content, user access, and sales" on the website. *Capitol Recs., LLC,* 934 F. Supp. 2d at 660 (citation omitted). Control is interpreted expansively, and infringers can "control the activities of their users simply by virtue of providing the means to commit direct infringement." *Gershwin*, 443 F.2d at 1173.

Shutterstock controlled all photographs on its site and directly "provided the means to infringe" by distributing high-resolution copies of McGucken's photographs to 938 licensees, each of whom then infringed by exploiting his work on websites, merchandise and so on. And Shutterstock had the right to limit or stop the infringement because, as happened in this case (albeit extremely belatedly), it had the right to send "kill notices" to its licensees to terminate their licenses and require removal of the photographs. **App. 1207, 1607-1609**. This suffices for "control."

Finally, vicarious liability is unaffected by the safe harbor because Shutterstock's distribution of McGucken's work to its licensees and its licensees' infringement was not "by reason of storage at the direction of the user." Shutterstock's licensees have displayed McGucken's photographs as part of their own websites and advertisements, incorporated them into retail products and their packaging, and published them in books. Such direct acts of infringement, made possible by and financially benefiting Shutterstock, are outside the scope of the safe harbor.

Because Shutterstock had a financial interest in and the right and ability to control the direct infringement of its licensees and partners, and this infringement arose from conduct beyond the storage or accessing of material on Shutterstock's platform, Shutterstock is liable for vicarious infringement outside the safe harbor. The district court erred in failing to address same.

## 2. Shutterstock is liable for contributory infringement

Shutterstock is also contributorily liable for the direct infringement of its licensees and third-party partners. A contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *EMI Christian Music Grp., Inc.,* 844 F.3d at 99–100. Shutterstock induced, caused, or materially contributed to its licensees' and partners' infringement by providing to them the infringing photographs. And

60

Shutterstock had knowledge of the infringing activity by no later than the date this case wase filed with the district court yet failed to exercise its ability to terminate the 938 licenses and direct its licensees to cease exploiting the photographs for at least four months after receiving notice, and failed to "disable access" to TinEye, StockFresh and HelloRF to the Infringing Copies until at least July, August, and September 2022, respectively. **App. 1207-1218.** Shutterstock thus had knowledge of the infringement by its licensees and induced, caused, and contributed to it. There is at least a triable issue as to contributory infringement.

***

The district court erred in failing to rule on the vicarious and contributory infringement causes of action.

### D. The district court erred by overlooking McGucken's claim for injunctive relief

The "DMCA safe harbors do not render a service provider immune from copyright infringement." *Corbis Corp. v. Amazon.com, Inc*., 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004), citing *Ellison*, 357 F.3d at 1077. Instead, they protect eligible service providers from all monetary and most equitable relief that may arise from copyright liability. Id. at 1098-1099, citing 17 U.S.C. § 512(a)-(d), (j). When an infringer subject to the safe harbor infringes an artist's rights, that artist will still be entitled to the limited injunctive relief set forth in 17 U.S.C. § 512(j),

including an order requiring removal of infringing content. Id., citing 17 U.S.C. §§ 512(a)-(d), (j); *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Services, Inc.,* 351 F.3d 1229, 1234 (D.C. Cir. 2003).

Here, McGucken sought injunctive relief in the form of an order requiring Shutterstock to remove his work from their servers and partner and licensee sites, acts which persist to this day.[10] **App.41-42, ¶a**. The Court failed to rule on this request for relief, perhaps believing it to be addressed by its ruling on the DMCA safe harbor. But the safe harbor does not preclude injunctive relief and this was error.

## VII. CONCLUSION

The DMCA's safe harbor should be construed narrowly to protect passive service providers, like YouTube. It should not excuse the infringement of stores like Shutterstock simply because they operate online. Doing so rewards infringement—and turning a blind eye to same—and divests an artist of the ability to enforce their rights.

---

[10] See Chicago Tribune, https://www.chicagotribune.com/2020/09/16/stunning-sights-in-national-parks-during-peak-fall-foliage/ (last visited February 12, 2024); Promotional Calendars Source, https://www.promotionalcalendarssource.com/sample_request.php?pid=1163 (last visited February 12, 2024).

Shutterstock is not a service provider who facilitates online interactions, it is a digital media retailer that directly sells licenses to its customers, in competition with photographers like McGucken. Allowing such a company to exploit the safe harbor to limit liability contravenes the statute's text and skews the balance Congress sought to strike with §512.

This Court should thus reverse and remand either with a directive to enter summary judgment in McGucken's favor on one or more of his claims or an instruction to address the claims and injunctive relief request that the district court failed to rule on and then set this matter for trial.

Respectfully submitted,


Dated: February 13, 2024        By:    /s/ Scott Alan Burroughs
                                       Scott Alan Burroughs, Esq.
                                       DONIGER / BURROUGHS
                                       247 Water Street, First Floor
                                       New York, New York 10038
                                       scott@donigerlawfirm.com
                                       (310) 590 - 1820
                                       Attorney for Plaintiff-Appellant

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.     This document complies the word limit of Fed. R. App. P. L.R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains **13,845** words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word version 16.78 in 14-point Times New Roman.

By:     */s/ Scott Alan Burroughs*
         Scott Alan Burroughs, Esq.
         DONIGER / BURROUGHS
         *Attorney for Plaintiff-Appellant*
         Dated: February 13, 2024

## CERTIFICATE OF SERVICE

The undersigned counsel for Appellant hereby certified that on February 13, 2024, the foregoing was filed with the Clerk of Court for the United States Court of the Second Circuit by using the Second Circuit's ACMS system. The undersigned further certifies that all participants in the case are registered users of said system, and that service is thereby effected on Appellee in accordance with Local Rule 25.1(h) upon the electronic filing of this document.

By:  */s/ Scott Alan Burroughs*
Scott Alan Burroughs, Esq.
DONIGER / BURROUGHS
*Attorney for Plaintiff-Appellant*
Dated: February 13, 2024