# 23-7652-cv

## United States Court of Appeals

*for the*

## Second Circuit

ELLIOT MCGUCKEN, an individual,

*Plaintiff-Appellant,*

– v. –

SHUTTERSTOCK, INC., a Delaware corporation,

*Defendant-Appellee,*

– v. –

DOES 1-10,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, CASE NO. 1:22-CV-905

## BRIEF OF DEFENDANT-APPELLEE SHUTTERSTOCK, INC.

ELEANOR M. LACKMAN
MARISSA B. LEWIS
MITCHELL SILBERBERG & KNUPP LLP
437 Madison Avenue, 25th Floor
New York, New York 10022
(212) 509-3900

*Attorneys for Defendant-Appellee*

CP COUNSEL PRESS     (800) 4-APPEAL • (329119)

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee Shutterstock, Inc., by and through its undersigned attorneys, states that it does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 4

STATEMENT OF THE CASE.................................................................. 5

    I.      STATEMENT OF FACTS................................................................ 5

          A.    Shutterstock and Its Longstanding Contributor Platform...........5

          B.    Shutterstock's Automatic Processing of Contributors' Images ......................................................................................6

          C.    Appellant Elliott McGucken ......................................................8

          D.    The Images at Issue...................................................................9

    II.     PROCEDURAL HISTORY ............................................................ 11

STANDARD OF REVIEW .................................................................. 11

SUMMARY OF ARGUMENT .............................................................. 12

ARGUMENT ................................................................................... 15

    I.      THE DISTRICT COURT PROPERLY HELD THAT THE DMCA PROTECTED SHUTTERSTOCK FROM APPELLANT'S INFRINGEMENT CLAIMS ................................. 15

          A.    The DMCA Was Designed to Provide Protection to Online Service Providers that, Like Shutterstock, Operate in Good Faith........................................................................................15

          B.    Appellant's Efforts to Dissect and Rewrite the Safe Harbor Are Unavailing. .......................................................................16

               1.    Shutterstock Is a "Service Provider." ............................ 17

               2.    Contributors Submitted Images to Be Hosted on Shutterstock's Systems—Exactly the Activity Section 512(c) Contemplates—Which Was the Cause of the Alleged Violations Appellant Complains About Here.................................................................. 23

                      a.    Contrary to Appellant's claim about bulletin boards, this Circuit has held repeatedly that

# TABLE OF CONTENTS
### (continued)

**Page**

providers with roles in the operation of their systems are covered by the DMCA .................... 25

b. There is no "carve-out" in the DMCA safe harbor for particular copyright rights or particular copyright violations. ........................... 30

c. What others may have done with the images is irrelevant to the question of Shutterstock's liability ................................................................ 33

C. The District Court Correctly Found that the Three Conditions for Entitlement to the Safe Harbor Apply. ............. 35

1. Appellant *Ensured* that Shutterstock Would Not Be Aware of All but One of the Uses. ................................ 36

2. Shutterstock Never Received a Financial Benefit from the Allegedly Infringing Activity and Had No Right or Ability to Control in Any Case. ...................... 39

D. The District Court Correctly Found that Shutterstock Meets the Other Threshold Requirements for Safe Harbor. ................ 42

1. Shutterstock Has Adopted and Implements a "Repeat Infringer" Policy. .......................................................... 42

2. Shutterstock Does Not Interfere With "Standard Technical Measures." ................................................... 43

E. A Circuit Split Would Occur Only if the Decision Below Were Reversed. ....................................................................... 45

F. None of Appellant's Policy Arguments Warrants Upending Longstanding U.S. Law or the International Treaties that the DMCA Tracks. .......................................................................... 46

G. Appellant's Belated Request for Prospective Injunctive Relief Directly Conflicts with the DMCA and Second Circuit Law. ............................................................................. 48

II. SHUTTERSTOCK'S SATISFACTION OF THE DMCA ELEMENTS CONFIRMS IT COULD NOT BE LIABLE FOR CONTRIBUTORY OR VICARIOUS INFRINGEMENT ................ 50

## TABLE OF CONTENTS
<u>(continued)</u>

**<u>Page</u>**

III.   THE DISTRICT COURT CORRECTLY DISMISSED
       APPELLANT'S SECTION 1202 CLAIMS AS A MATTER OF
       LAW .................................................................................. 52

    A.   Shutterstock's Use of a "Shutterstock" Watermark Does
           Not Violate § 1202(a). ..........................................................52

    B.   Shutterstock Did Not Remove CMI in Violation of
           § 1202(b). ..............................................................................55

CONCLUSION ...................................................................................... 57

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Agence France Presse v. Morel*,
  934 F. Supp. 2d 547 (S.D.N.Y. 2013) ........................................................21, 22

*American Tel. & Tel. Co. v. N.Y.C. Human Res. Admin.*,
  833 F. Supp. 962 (S.D.N.Y. 1993) ....................................................................54

*Arista Records LLC v. Lime Grp., LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011) ...............................................................51

*Arista Recs. LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009) ...............................................................40

*Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*,
  No. 18-CV-3403-SAG, 2021 WL 5359671 (D. Md. Nov. 17, 2021) ...............31

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC*,
  69 F. Supp. 3d 342 (S.D.N.Y. 2014) .................................................................51

*BWP Media USA Inc. v. Polyvore*,
  922 F.3d 42 (2d Cir. 2019) .........................................................................*passim*

*Capitol Records, Inc. v. MP3tunes, LLC*,
  821 F. Supp. 2d 627 (S.D.N.Y. 2011) ...............................................................41

*Capitol Records, LLC v. Vimeo, LLC*,
  826 F.3d 78 (2d Cir. 2016) .........................................................................*passim*

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).............................................................................................12

*Columbia Pictures Indus., Inc. v. Fung*,
  710 F.3d 1020 (9th Cir. 2013) ...........................................................................42

*Corbis Corp. v. Amazon.com, Inc.*,
  351 F. Supp. 2d 1090 (W.D. Wash. 2004) ..................................................19, 45

## TABLE OF AUTHORITIES
<u>(continued)</u>

**<u>Page(s)</u>**

*Costar Grp. Inc. v. Loopnet, Inc.*,
  164 F. Supp. 2d 688, 692 (D. Md. 2001) *aff'd,* 373 F.3d 544 (4th Cir.
  2004) ..................................................................................................................30

*Craig v. UMG Recordings, Inc.*,
  380 F. Supp. 3d 324 (S.D.N.Y. 2019) .............................................................55

*Desire, LLC v. Manna Textiles, Inc.*,
  986 F.3d 1253 (9th Cir. 2021) .........................................................................34

*Disney Enters., Inc. v. Hotfile Corp.*,
  No. 11-CV-20427, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013).....................43

*Downs v. Oath Inc.*,
  385 F. Supp. 3d 298 (S.D.N.Y. 2019) ..............................................................28

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004) .........................................................................51

*Friedman v. Live Nation Merch., Inc.*,
  833 F.3d 1180 (9th Cir. 2016) ...................................................................54, 56

*Gardner v. CafePress Inc.*,
  No. 13-CV-1108-GPC-JMA, 2014 WL 794216
  (S.D. Cal. Feb. 26, 2014) ..........................................................................22, 44

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*,
  443 F.2d 1159 (2d Cir. 1971) .........................................................................51

*Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*,
  345 F.3d 922 (6th Cir. 2003) ..........................................................................56

*Greg Young Publ'g Inc. v. Zazzle, Inc.*,
  No. 16-CV-4587, 2017 WL 2729584 (C.D. Cal. May 1, 2017)............20, 21, 22

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)........................................................................................47

## TABLE OF AUTHORITIES
<u>(continued)</u>

<u>Page(s)</u>

*Hendrickson v. eBay, Inc.*,
    165 F. Supp. 2d 1082 (C.D. Cal. 2001) ............................................................20

*In re Aimster Copyright Litig.*,
    252 F. Supp. 2d 634 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003)........18

*Io Grp., Inc. v. Veoh Networks, Inc.*,
    586 F. Supp. 2d 1132 (N.D. Cal. 2008)............................................................40

*JLM Couture, Inc. v. Gutman*,
    91 F.4th 91 (2d Cir. Jan. 17, 2024)....................................................................21

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ...............................................................................31

*Krechmer v. Tantaros*,
    747 F. App'x 6 (2d Cir. 2018) ............................................................................52

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    753 F.3d 395 (2d Cir. 2014) ...............................................................................12

*Mango v. BuzzFeed, Inc.*,
    356 F. Supp. 3d 368 (S.D.N.Y. 2019),
    *aff'd*, 970 F.3d 167 (2d Cir. 2020)................................................................54, 56

*Matthew Bender & Co., Inc. v. W. Pub. Co.*,
    158 F.3d 693 (2d Cir. 1998) .........................................................................50, 51

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
    873 F.3d 1045 (9th Cir. 2017) ...............................................................28, 45, 46

*McGucken v. Lonely Planet Global, Inc.*,
    No. 22-CV-5476-DMG-SKX,
    2023 WL 4206107 (C.D. Cal. May 11, 2023)....................................................34

*Michael Grecco Prods., Inc. v. Alamy, Inc.*,
    372 F. Supp. 3d 131 (E.D.N.Y. 2019)....................................................22, 40, 54

### TABLE OF AUTHORITIES
(continued)

Page(s)

*Morales v. Quintel Entm't, Inc.*,
249 F.3d 115 (2d Cir. 2001) ................................................................12

*Obodai v. Demand Media, Inc.*,
No. 11-CV-2503-PKC, 2012 WL 2189740 (S.D.N.Y. June 13, 2012),
*aff'd sub nom. Obodai v. Cracked Entm't. Inc.*,
522 F. App'x 41 (2d Cir. 2013) ...........................................................19

*Pagan v. NYNEX Pension Plan*,
52 F.3d 438 (2d Cir. 1995) .................................................................12

*Penske Media Corp. v. Shutterstock, Inc.*,
548 F. Supp. 3d 370 (S.D.N.Y. 2021) ................................................53

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007) ............................................................42

*Pickholtz v. Rainbow Techs., Inc.*,
260 F. Supp. 2d 980 (N.D. Cal. 2003) ...............................................50

*Playboy Enters, Inc. v. Webbworld, Inc.*,
991 F. Supp. 543 (N.D. Tex. 1997),
*aff'd*, 168 F.3d 486 (5th Cir. 1999).....................................................22

*Post Univ. v. Course Hero, Inc.*,
No. 3:21-CV-1242-JBA, 2023 WL 5507845 (D. Conn. Aug. 25, 2023) ...........53

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*,
351 F.3d 1229 (D.C. Cir. 2003).........................................................49

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004).........................................................................48

*Roadget Bus. Pte. Ltd. v. PDD Holdings Inc.*,
No. 22-CV-7119, 2023 WL 4865005 (N.D. Ill. July 31, 2023) .........45

*Rock River Commc'ns, Inc. v. Universal Music Group, Inc.*,
No. 08-CV-635-CAS-AJW, 2011 WL 1598916 (C.D. Cal. Apr. 27, 2011) ......31

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page(s)</u>

*Shihab v. Complex Media, Inc.*,
    No. 21-CV-6425-PKC, 2022 WL 3544149 (S.D.N.Y. Aug. 17, 2022) .............56

*Sid Avery & Assocs., Inc. v. Pixels.com, LLC*,
    479 F. Supp. 3d 859 (C.D. Cal. 2020) ................................................................27

*Steinmetz v. Shutterstock, Inc.*,
    629 F. Supp. 3d 74 (S.D.N.Y. 2022), *appeal withdrawn*, No. 22-2699,
    2022 WL 19560566 (2d Cir. Dec. 8, 2022)................................................*passim*

*Stevens v. Corelogic, Inc.*,
    899 F.3d 666 (9th Cir. 2018) ..............................................................................57

*Thron v. HarperCollins Publishers, Inc.*,
    No. 01-CV-5437-JSR, 2002 WL 1733640 (S.D.N.Y. July 26, 2002)..........54, 57

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ....................................................................*passim*

*Ventura Content, Ltd. v. Motherless, Inc.*,
    No. 11-CV-5912-SVW-FMO, 2013 WL 11237204 (C.D. Cal. July 3,
    2013), *aff'd*, 885 F.3d 597 (9th Cir. 2018) ..................................................*passim*

*Viacom Int'l Inc. v. YouTube, Inc.*,
    718 F. Supp. 2d 514 (S.D.N.Y. 2010), *aff'd in relevant part*,
    676 F.3d 19 (2d Cir. 2012) ........................................................................*passim*

*Weissmann v. Freeman*,
    868 F.2d 1313 (2d Cir. 1989) ..............................................................................31

*Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*,
    210 F. Supp. 2d 147 (E.D.N.Y. 2002), *aff'd sub nom.*,
    354 F.3d 112 (2d Cir. 2003) ................................................................................31

*Wolk v. Kodak Imaging Network, Inc.*,
    840 F. Supp. 2d 724 (S.D.N.Y. 2012),
    *aff'd sub nom. Wolk v. Photobucket.com, Inc.*,
    569 F. App'x 51 (2d Cir. 2014) ..................................................................*passim*

**TABLE OF AUTHORITIES**
<u>(continued)</u>

**Page(s)**

*Zuma Press, Inc. v. Getty Images (US), Inc.*,
349 F. Supp. 3d 369 (S.D.N.Y. 2018) ...............................................................53

**RULES & STATUTES**

17 U.S.C. § 106...............................................................................................30

17 U.S.C. § 512................................................................................................*passim*

17 U.S.C. § 512(a) ..........................................................................................26

17 U.S.C. § 512(c) ..........................................................................................*passim*

17 U.S.C. § 512(f) ...........................................................................................31

17 U.S.C. § 512(i) ...........................................................................42, 43, 44

17 U.S.C. § 512(k) ...........................................................................17, 21

17 U.S.C. § 512(m) .........................................................................................29

17 U.S.C. § 1202 ..............................................................................................*passim*

17 U.S.C. § 1202(a) ..........................................................................52, 53, 54

17 U.S.C. § 1202(b) ..........................................................................55, 56, 57

Fed. R. Civ. P. 12(b)(6)....................................................................22, 53

Fed. R. Civ. P. 56(c)........................................................................................12

**OTHER AUTHORITIES**

H.R. Rep. No. 105-551, pt. 2 (1998) ...................................31, 38, 46, 50

S. Rep. No. 105-190 (1998)............................................................16, 46

Standard Technical Measures and Section 512:
Notification of Inquiry, U.S. Copyright Office,
87 Fed. Reg. 25,050 (Apr. 27, 2022) ...............................................44

**TABLE OF AUTHORITIES**
<u>(continued)</u>

**Page(s)**

U.S. Copyright Office, Section 512 of Title 17:
    A Report of the Register of Copyrights (2020),
    https://www.copyright.gov/policy/section512/section-512-full-report.pdf .......21

## PRELIMINARY STATEMENT

Over twenty years ago, Defendant-Appellee Shutterstock, Inc. ("Shutterstock") identified a problem: amateur and professional creators around the world had copyright-protected works that they wanted to distribute, and users of works were looking for a way to access, for license, legitimate and authorized material. Shutterstock's creator platform—like Getty Images' iStock and Adobe's Adobe Stock platforms—solved this problem by connecting these third-party creator-sellers with user-buyers. This is no different than what Amazon, eBay, Etsy, Facebook Marketplace, and YouTube do with respect to a wide variety of products and services that are the subject of millions of transactions each day. All of these platforms are able to operate because the Digital Millennium Copyright Act ("DMCA") protects them in the event that a third party lists an item or other content on their platforms that another party claims is infringing. Without the DMCA, these online marketplaces would shut down for fear of endless litigation. As a result of the DMCA, these online marketplaces have flourished and become a vital part of the American economy.

When the DMCA was enacted over twenty-five years ago, it took into account that copyright owners and platforms both would operate in good faith. If a platform did not encourage infringement, did not become extensively involved with the material (other than policing for policy violations, at its option), and

responded to DMCA-compliant requests from copyright owners, one of the DMCA's "safe harbors" would shelter the platform from liability.

The part of Shutterstock's business that is composed of the "contributor platform" falls directly in line with these terms: Shutterstock permits third-party "contributors" to upload their images via an online portal and, after a brief review for objectionable content (*e.g.*, pornography, hate speech, spamming) or indicia that the contributor already has been terminated from the platform, the images are made available to prospective customers to license on Shutterstock.com. A single fee is charged for any image the customer chooses to license, under a small and standard set of easy terms that give flexibility to the contributor and customer. Like similar platforms, Shutterstock takes a percentage of the sale and pays the contributor the rest. As a result of the DMCA's protections, Shutterstock has paid over $1 billion to creators who have taken advantage of Shutterstock's global reach and broad customer base to monetize their works.

Plaintiff-Appellant Elliot McGucken ("Appellant"), for his part, chose not to cooperate, contrary to what the DMCA envisioned. Appellant should have known that as a trusted provider of over 424 million images, Shutterstock does not tolerate infringement on its website and would take prompt action if a copyright owner sent a notice. Yet, despite being aware of broader use and without saying why, Appellant sent one notice over *just one* of the 337 images at issue in this case.

Nonetheless, the alleged infringers were identified and terminated due in part to *Shutterstock's* own diligence: despite having received no notice from Appellant, by the time Appellant filed in court the complaints identifying for the first time the other 336 images that purportedly infringe his copyrights, Shutterstock already had removed them from its customer-facing website and terminated the accounts of the contributors who uploaded them. This is exactly—if not better than—the result that Congress contemplated when the DMCA was enacted, albeit delayed due to Appellant's deliberate inaction.

The District Court appropriately rejected Appellant's Motion for Summary Judgment and granted Shutterstock's, just as a different judge in the Southern District of New York did when confronted with a similar claim via Appellant's counsel over the same platform. Apart from citing material that has nothing to do with the contributor platform applicable here, Appellant identifies no factual or legal errors in the opinion below. Rather, the crux of Appellant's appeal is that this Court should revamp the law: that the DMCA should be limited only to "online bulletin board operators," copyright owners should not have to submit notices, and platforms should become experts in millions of contributors' portfolios, ownership status, and licensing terms. Essentially, Appellant insists that Shutterstock's contributor platform—and that of Getty, Adobe, and anyone else who offers a primarily-automated system connecting suppliers and consumers—should be

subject to massive exposure for what a few lone wolves might do in violating platforms' terms of service and defrauding those platforms and the public. Appellant's contortion of the undisputed factual record and disregard of the law confirms the hollowness of his endeavor. Not only is his appeal meritless as a matter of law, it runs directly counter to the core policies of this country's copyright laws and years of precedent from this Circuit and others regarding the DMCA.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Did the District Court correctly find that an automated platform that connects creators with potential licensees, engages in limited review to block listing of material that violates Shutterstock's terms of service and policies, and takes additional steps to minimize infringement on its platform, is protected by the Section 512(c) safe harbor of the DMCA, 17 U.S.C. § 512(c)?

2. Did the District Court properly find, on a factually undisputed record, that Shutterstock's intentions in separating metadata and adding watermarks were driven by the avoidance of, rather than the furtherance of, infringement, privacy violations, and other damage?

## STATEMENT OF THE CASE

### I.    STATEMENT OF FACTS

#### A.    Shutterstock and Its Longstanding Contributor Platform

Shutterstock is in the business of supporting creative expression. Among the ways it does so is by operating a leading global online marketplace for photographic images and other content (such as video footage and music) at the website www.shutterstock.com, thereby ensuring that creators have access to legal, licensed content that they may wish to incorporate into their own works. A.237 ¶ 2. Over 424 million images are available for license on Shutterstock's website, and 200,000 images are added every day. *Id.* While some of Shutterstock's content is obtained through catalog acquisitions and license agreements with major content libraries, this represents only part of Shutterstock's business.

Since its founding over twenty years ago, Shutterstock also has obtained content through third-party "contributors." A.237 ¶ 3. Aligned with copyright law's goals of incentivizing the creation and dissemination of creative works, Shutterstock's "contributor platform"—like that of Shutterstock's competitors— allows creators to offer their works for license to prospective customers, who know Shutterstock as a source for high-quality content that may be licensed with the click of a button for a reasonable price pursuant to one of Shutterstock's standard licensing models. A.237 ¶ 3; A.241-42 ¶ 18. Logically, the existence of these

5

platforms increases the use of content pursuant to paid licenses and drives down incentives to infringe.

Over *two million* individuals worldwide—ranging from professional artists to amateur photographers with nothing but a smartphone in-hand—have chosen to make their content available for license through Shutterstock's platform. A.238 ¶ 4.[1] Before uploading any content to Shutterstock's platform, all contributors must accept and agree to Shutterstock's "Contributor Terms of Service" (*id.* ¶ 5), thereby affirming that "the Content [that they submit to Shutterstock] does not infringe the copyright or any other rights of any third party" (*id.*).

### B. Shutterstock's Automatic Processing of Contributors' Images

As with any widely-used tool, there is a possibility of abuse, fraud, and other violations of Shutterstock's Contributor Terms of Service. Shutterstock has a number of processes in place to avoid such issues. For example, contributors and prospective customers do not want to see content on Shutterstock's platform alongside racist or obscene material, blurred imagery, or "spam" (*i.e.*, dozens of identical or near-identical images uploaded in order to drown out other creators' works from search results). A.260-61 ¶ 10. Accordingly, Shutterstock has a team

---

[1] Contrary to Appellant's suggestion in his opening brief (cited herein as "Br.") at 16, the *contributor*—not Shutterstock—decides what images to upload to Shutterstock's platform, and can remove those images at any time (subject to limitations designed to avoid disrupting any existing license). A.239 ¶ 7; A.2363 ¶ 13.

of reviewers who spend roughly twenty seconds per image reviewing for these types of obvious violations. A.239-40 ¶ 10. The reviewers also check the search terms and title that the contributor supplies[2] to ensure, for example, that they reasonably match the image and contain no profanity or malware. *Id.* ¶¶ 10-11; A.2364-65 ¶ 17. If the image contains a visible watermark that does not correspond to the contributor or credit name, the image may be flagged. A.239-40 ¶ 10; A.2365 ¶ 18.

Apart from this brief review for apparent technical issues or policy violations, the entire process initiated by the contributor's decision to upload an image—from ingestion to issuing any licenses—is fully automated. A.240-41 ¶ 14. During the ingestion process, Shutterstock's system automatically separates out any metadata embedded into the contributors' image files to prevent computer viruses and protect personal information. A.241 ¶ 15. If an image is not rejected, it is added to the library of available images. A.261 ¶ 12. The Shutterstock website enables prospective licensees to search and preview each available image in

---

[2] This is not to be confused, as Appellant tries to do, with metadata that may accompany an image that the contributor uploads to Shutterstock. Metadata fields vary across devices and are often unknown to contributors, which can lead to inadvertent disclosures or transmission of harmful code. A.2082-83 ¶ 15(c). Accordingly, as every contributor agrees, Shutterstock's system *immediately* separates out the metadata accompanying the image and allows the contributor to then *add* whatever title and caption, and requested crediting, that she wants. ***This*** "metadata" is what is then sent to the human reviewer along with the image.

7

various sizes alongside the contributor's information and the pricing for licenses. A.241-42 ¶¶ 16, 18. To protect the image from being copied without paying, Shutterstock's system places a "Shutterstock" watermark across the image. A.241 ¶ 17. Only a licensee that pays (or has a trial subscription) can access an unwatermarked image. A.242 ¶ 19. All of this is industry-standard. A.2084-85 ¶ 18. To help ensure the creator's work gets the maximum visibility, API (application programming interface) technology is available for other platforms to use ("API User Platforms") to help facilitate licensing of available works through the network. A.271 ¶ 71.

In addition to automatic application of watermarks and very brief human review, Shutterstock also offers other tools to keep the platform safe for its users and deter third-party abuse. A.240 ¶ 11; A.242-43 ¶¶ 21, 23, 25-26; A.261 ¶ 11. Notably, Shutterstock has received relatively few DMCA takedown notices in connection with contributor-uploaded images, and many are sent in error. A.244 ¶ 27. For example, in 2021, the rate of DMCA takedown notices, valid or not, was approximately 0.005% for content uploaded that year, and 0.001% across all existing content. *Id.*

### C.    Appellant Elliott McGucken

Appellant is an ex-professor turned photographer who earns a living through unnoticed litigations like this one. Appellant has reaped hundreds of thousands of

dollars, if not more, from filing lawsuits that settle for just below the cost of defense. A.1757-60; A.2391-92. Appellant's status as a frequent litigator arises from his uploading hundreds of thousands of his images in high-resolution to social media websites, such as Flickr, which encourage the widespread sharing of images. A.2393, 2406-07, 2411, 2412-13, 2415. While he waits for third parties to use his images without permission, Appellant uses the group registration option at the U.S. Copyright Office to submit hundreds of photographs for a single fee, entitling him to seek statutory damages in an amount that far exceeds the value of an actual license. A.272 ¶¶ 78-82.

### D.    The Images at Issue

This action arises from the undisputed fact that 337 of Appellant's purported images (collectively, the "Images") were uploaded to Shutterstock's platform by third-party contributors, namely, Moajjem Hossain a/k/a Hane Street ("Hane Street"), Gouranga Charan Bishoi ("Bishoi"), and Muhammad Raza a/k/a Raza 76j ("Raza") (collectively, "Contributors"). A.266-67 ¶¶ 41-48. If the Contributors were not authorized to do so,[3] this would violate Shutterstock's Contributor Terms of Service. A.238 ¶¶ 5-6.

---

[3] Applicant has never proven how the Contributors obtained the Images nor that the Contributors were unauthorized to upload them to Shutterstock.

Despite being aware of the broader problem, Appellant waited silently as innocent licensees took the bait. On or about January 15, 2021, Appellant sent a DMCA notice to Shutterstock requesting removal of a single Image (the "Noticed Image"). A.265 ¶¶ 34-35.[4] Shutterstock removed it within two business days. A.265 ¶ 36. Shutterstock received no notice regarding the other Images until it received the Complaint over a year later. A.266-67 ¶¶ 44, 49. Yet, by the time Appellant notified Shutterstock of the other Images, Shutterstock already had removed them from its website and terminated the Contributors' accounts. A.266-68 ¶¶ 45-46, 50. Figure 1 below groups the Images by Contributor and lists the corresponding dates of Appellant's notice and Shutterstock's removal.

Figure 1

| Contributor | Image(s) | Date Notified by Appellant | Date Removed |
|---|---|---|---|
| Hane Street | Noticed Image | Jan. 15, 2021 (Takedown Notice) | Jan. 19, 2021 |
| | 324 | Feb. 2, 2022 (Complaint) | Feb. 11, 2021 |
| Bishoi | 1 | Feb. 2, 2022 (Complaint) | Jan. 23, 2019 |
| Raza | 12 | Apr. 29, 2022 (Amended Complaint) | Apr. 18, 2022 |

Appellant admittedly has never licensed *any* of the Images to anyone. A.273 ¶¶ 87-88. Over half of the Images were never licensed from Shutterstock and, thus,

---

[4] Appellant's earlier regarding the Noticed Image omitted critical information. A.245 ¶ 30.

Shutterstock never provided full-sized, unwatermarked copies to anyone. A.270 ¶¶ 66-67. The others were licensed on-demand through Shutterstock's website, generating $2,131.60 in revenue. A.270 ¶ 64. Shutterstock has since sent "kill notices" instructing the licensees of the Images (the "Licensees") to cease all use, if any. A.268-69 ¶ 68.[5]

## II. PROCEDURAL HISTORY

On February 2, 2022, Appellant sued. A.2345. Two months later, Appellant amended the Complaint, adding twelve additional Images. A.35. As in *Steinmetz v. Shutterstock, Inc.*, 629 F. Supp. 3d 74 (S.D.N.Y. 2022), *appeal withdrawn*, No. 22-2699, 2022 WL 19560566 (2d Cir. Dec. 8, 2022),[6] the Court granted Shutterstock's Motion for Summary Judgment, and denied Plaintiff's Motion for Summary Judgment, on all claims. SPA.23.[7]

## STANDARD OF REVIEW

On appeal from a grant of summary judgment, this Court "review[s] the record *de novo* to determine whether genuine issues of material fact exist requiring

---

[5] Shutterstock knows the type of license obtained, but does not know whether a licensee actually uses the image or how. A.2366 ¶ 21.

[6] *Steinmetz* is a highly analogous case. In *Steinmetz*, the plaintiff photographer alleged the same three claims against Shutterstock as alleged by Appellant. *Id.* at 77. The court dismissed all of them on summary judgment. *Id.* at 85-86.

[7] As the prevailing party, Shutterstock sought to recover its reasonable attorneys' fees and costs. The parties consented to a stay.

a trial." *Morales v. Quintel Entm't, Inc*., 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Where there are no disputed issues of material fact, this Court's "task is to determine whether the district court correctly applied the law." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995) (citation omitted). "It is well settled that this Court 'may affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the district court.'" *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 (2d Cir. 2014) (citation omitted).

## <u>SUMMARY OF ARGUMENT</u>

In enacting the DMCA, Congress recognized that good-faith platforms of various types should not be exposed to litigation and liability for others' copyright infringement, where a third-party user of the platform supplies copyrightable material and third parties are able to access the material. Among other services, Shutterstock operates one of those platforms: one through which over two million creators around the world submit their works to a common location, where licensees know to come for authorized works under a standard set of license terms. Like Congress, Shutterstock is aware that there are some bad apples out there— either willfully or because, for example, they are unaware of the terms under which

12

parties like Appellant supply their works on social media "sharing" sites—and Shutterstock relies on the DMCA for protection. Shutterstock performs under the DMCA's terms, and beyond, through its near-fully-automated system. Shutterstock reviews for policy violations, identifies and blocks those who have been subject to notices, implements a repeat-infringer policy, employs technology to detect and reduce infringement and other fraud, maintains a registered DMCA agent, and responds to DMCA-compliant notices expeditiously. Shutterstock's rate of DMCA takedown notices (valid or not) speaks for itself: over 99.995% of content on the platform never receives any notice. Here, except for the Noticed Image that Shutterstock promptly disabled upon notice, Shutterstock disabled ***all*** of the accused content before it was ever mentioned by Appellant in any form.

As the District Court properly found in its careful opinion, Shutterstock is protected against claims of all types of direct and indirect copyright infringement by the plain terms of the DMCA, and by this Circuit's extensive precedent confirming that parties similarly situated to Shutterstock are protected. Just like many other platforms that connect suppliers and consumers, Shutterstock fits well within the scope of "service provider" regarding its platform, and Appellant offers no reliable authority otherwise. Shutterstock's contributor platform inherently involves images chosen and ***submitted by users*** to be made available through Shutterstock's automated system to prospective licensees of contributor-owned

13

images. They are made available unless they are blocked for policy violations. This is exactly the activity that Section 512(c) of the DMCA contemplates, and extensive authority confirms that Shutterstock meets the test. Indeed, Appellant's suggestion that Shutterstock's review for policy violations takes it outside the DMCA would require the Court to ignore not just *stare decisis*, but express statutory language.

Appellant's efforts hinge on misrepresenting the undisputed record about the contributor platform, pointing instead to other segments of the business, and taking a blinkered view of the user-driven platform at issue. On an undisputed factual record, Appellant even falsely alleges that Shutterstock engages in extensive interaction with the substantial number of works that contributors submit through the platform daily. As Judge Rearden properly found, Appellant failed in his effort to make the platform something it is not. Appellant also misconstrues or entirely disregards on-point rulings from this Circuit, placing nearly full reliance on an overstated characterization of one ruling from the Ninth Circuit that, in fact, supports the decision below. Perhaps recognizing the core problems in his appeal, Appellant falls back on a policy argument, claiming that he should not have to send DMCA notices, Shutterstock's platform should not exist, and—contrary to law— he should receive double recovery for uses by licensees and Shutterstock pertaining to the same image. This misguided posturing is unwarranted here.

14

Finally, Appellant fails to show error in the District Court's ruling that Shutterstock did not violate Section 1202 of the Copyright Act. Appellant had every opportunity to demonstrate falsity and the requirements under the double-scienter test, but all he argues now is speculation that, even after testing this theory twice in extensive discovery, the facts might be different at trial. Objectively, the argument also suffers from a fundamental flaw: Shutterstock's platform exists to provide an *alternative* to infringement, and its existence depends on contributors supplying *only* authorized material to the licensees who trust the platform as a source for authorized material. The steps Shutterstock takes are unrebutted, well-justified, and cannot raise an issue of fact. The ruling below should be affirmed accordingly.

## ARGUMENT

## I.    THE DISTRICT COURT PROPERLY HELD THAT THE DMCA PROTECTED SHUTTERSTOCK FROM APPELLANT'S INFRINGEMENT CLAIMS

### A.    The DMCA Was Designed to Provide Protection to Online Service Providers that, Like Shutterstock, Operate in Good Faith.

As the District Court properly observed, "defendants who fall within the DMCA's Safe Harbor provisions, 17 U.S.C. § 512, cannot be held liable for copyright infringement." SPA.8 (citations omitted). These statutory safe harbors—developed with the rising use of the internet and as part of implementation of international treaties—clarified the liability faced by online service providers that

transmit potentially infringing material over their networks. S. Rep. No. 105-190, at 2 (1998).

The Section 512(c) safe harbor is relevant here. As observed in *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78 (2d Cir. 2016):

> [W]hat Congress intended in passing § 512(c) was to strike a compromise [between copyright owners and service providers] under which, in return for the obligation to take down infringing works promptly on receipt of notice of infringement from the owner, Internet service providers would be relieved of liability for user-posted infringements of which they were unaware, as well as of the obligation to scour matter posted on their services to ensure against copyright infringement.

*Id.* at 89-90. Here, there is no dispute that Shutterstock expeditiously removes alleged infringing works upon notice from the owner. A.243 ¶¶ 24-26. Shutterstock is not required to proactively scour the millions of images on its platform for infringement. In exchange, Shutterstock is not liable for infringement for the contributor-supplied images. But Shutterstock did more here, removing 336 of the Images before notice from Appellant. A.248-49 ¶¶ 38, 41; SPA.16-18.

## B. Appellant's Efforts to Dissect and Rewrite the Safe Harbor Are Unavailing.

Appellant dissects Section 512(c)(1) into pieces so small, the context is nearly impossible to discern. This effort fails to deflect from the fact that, as the District Court found, the accused activities here fall well within the safe harbor.

16

Applicant focuses (Br. 14-28, 39-43) on the portion of Section 512(c) that reads: "A service provider shall not be liable . . . for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider" if certain factors (discussed *infra* Part I.C.) are not present. 17 U.S.C. § 512(c)(1). More simply, if infringement occurs on a service provider's system or network because of content that a user provided, then the safe harbor applies unless specific conditions exist. This is exactly what happened here: contributors uploaded their images to the contributor platform, where third parties could access those images. Appellant's diced-up analysis leads to no different result.

### 1.     Shutterstock Is a "Service Provider."

As the District Court properly observed, Shutterstock's contributor platform makes Shutterstock "a provider of online services or network access, or the operator of facilities therefor," as defined by the DMCA. SPA.9 (quoting 17 U.S.C. § 512(k)(1)(B)). Shutterstock provides a service where contributors can make images available online, as well as a network (including the API) through which the images are further promoted to increase the opportunity for licensees to find and license them. A.237 ¶¶ 2-3; A.255 ¶ 60.

Appellant tellingly buries this threshold element at the end of his DMCA argument; the corresponding arguments fail. For example, Appellant argues that

only certain types of service providers (*i.e.*, bulletin board operators) are service providers. This is wrong. One court even noted that it would have "trouble imagining the existence of an online service that *would not* fall under the definition[.]" *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 658 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003). Importantly, on voluminous cross-motions for summary judgment in *Steinmetz*, where the plaintiff was represented by the same counsel as Appellant, Judge Hellerstein found that "[Shutterstock] is a 'service provider' within the meaning of the statute" and "no reasonable finder of fact could otherwise conclude." *Steinmetz*, 629 F. Supp. 3d at 81-83. Judge Rearden undertook the analysis as well, following an opportunity for Appellant to flesh out whatever he thought might be deficient in Judge Hellerstein's decision, but Appellant still found nothing else that might suggest that Judge Hellerstein's prior analysis was incorrect in any way. *See* SPA.9 ("Shutterstock squarely falls within this definition [of 'service provider']").

Neither of these findings is surprising. This Circuit has repeatedly affirmed decisions finding that platforms like Shutterstock's—*i.e.*, where third-party contributors may choose to upload and offer their content to the public via standard, click-through agreements, which content may be automatically delivered to third-party licensees at their request—meet the definition of "service provider." *See, e.g.*, *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 743-44

(S.D.N.Y. 2012) (holding that website that hosts and allows users to upload and share content, and profits therefrom, is a "service provider"), *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014); *Obodai v. Demand Media, Inc.*, No. 11-CV-2503-PKC, 2012 WL 2189740, at *4, *8 (S.D.N.Y. June 13, 2012) (same), *aff'd sub nom. Obodai v. Cracked Entm't. Inc.*, 522 F. App'x 41 (2d Cir. 2013); *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 518 (S.D.N.Y. 2010) (same), *aff'd in relevant part*, 676 F.3d 19 (2d Cir. 2012).

Appellant nitpicks superficial perceived differences between Shutterstock's contributor platform and his perception of the various platforms that courts have held are "service providers," but this effort ignores the expansive language of the DMCA. Even if these platforms engaged in purportedly different activities, that does not mean that the plain and broad definition of "service provider" is limited ***only*** to those activities or is limited in some other way. *See Viacom*, 676 F.3d at 39 ("service provider" not limited to platforms that merely store material); *accord UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1017-19 (9th Cir. 2013) (noting the "reason one has a website is so that others may view it" and holding safe harbor "includes activities that go beyond storage" such as making and transmitting copies and modifying user-submitted material to facilitate storage and access). Systems need not be rudimentary or simple to qualify for DMCA protection: some of the most robust platforms online have qualified as "service

19

providers" entitled to safe harbor. *See*, *e.g.*, *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1094, 1099-1100 (W.D. Wash. 2004) (Amazon); *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1088 (C.D. Cal. 2001) (eBay); *see also Greg Young Publ'g Inc. v. Zazzle, Inc.*, No. 16-CV-4587, 2017 WL 2729584, at *6 (C.D. Cal. May 1, 2017) (website that "directly manufactur[es] and sell[s] physical products bearing the user-submitted images").

Despite the large body of law on the DMCA, Appellant does not cite anything for his supposition that Shutterstock's platform should be treated differently from those in the foregoing cases. He fails to identify how the activity here is so different, much less tie any purported difference to the DMCA or other authority. He vaguely suggests (Br. 43) that the third-party contributors and licensees must "connect" with each other, but the absence of a direct connection is *the point* behind insulating service providers from liability.[8]  His conjecture is simply that and nothing more.[9]

---

[8] As noted herein, the "direct licensing" concoction is legally and factually unsupported. Like Photobucket and others, Shutterstock merely operates an online platform through which third-party contributors may choose to upload and offer **their own content** to the public (A.237-38 ¶¶ 3, 5-6), and then automatically delivers that content to any third party that may choose to purchase it. A.2358-59 ¶ 4. Moreover, Shutterstock does not sell its own licenses, but rather enables contributors to offer their content for license via standard, click-through agreements for a lump-sum (*i.e.*, "royalty-free"). A.241-42 ¶ 18.

[9] Appellant refers (Br. 40) to a Copyright Office report, but this only further reveals the flaws in his argument. The language he quotes merely indicates that Section 512 enumerates categories of activities, as reflected in subsections (a)-(d).

Despite repeated rejection of attempts to rely on *Agence France Presse v. Morel*, 934 F. Supp. 2d 547 (S.D.N.Y. 2013) (*see* SPA.10; *Steinmetz*, 629 F. Supp. 3d at 81-82), Appellant again marshals it forward as his chief authority. This fails. As the District Court observed, *Morel* is an "outlier" on the DMCA and "contrary to the broad reading given by almost every court confronted with similar services and circumstances." SPA.10 (citations and quotations omitted); *see also Zazzle*, 2017 WL 2729584, at *6 ("*Morel* is an outlier for a reason: its analysis is not persuasive" and its "premise is faulty.").[10]

Further, the facts of *Morel* are inapposite and not what Appellant says they are. In *Morel*, the defendant agency, AFP, did not offer any online service for licensing content hosted by AFP at the direction of third parties. Rather, an AFP employee was searching for images online, found Morel's image on Twitter, copied it, and sent it to Getty for distribution under AFP's direct license agreement

─────────────────────

The report does *not* say that Section 512(c) (or the definition in Section 512(k)) *itself* has categories or is otherwise limited. To the contrary, the report goes on to identify the four broad categories, including the one at issue here. U.S. Copyright Office, Section 512 of Title 17: A Report of the Register of Copyrights, at 85 (May 2020), https://www.copyright.gov/policy/section512/section-512-full-report.pdf.

[10] Appellant claims (Br. 40) that this Circuit cited *Morel* "with approval," but omits that the case was about a breach of a non-compete provision of an employment agreement. *JLM Couture, Inc. v. Gutman*, 91 F.4th 91 (2d Cir. Jan. 17, 2024). In footnote 7 (not 2), the Circuit cited *Morel* for the unremarkable point that rights in social media accounts and rights in content on social media accounts may be owned by different parties. *Id.* at 103, n.7.

with Getty, and then Getty's employees had an active role in licensing the image. *See* 934 F. Supp. 2d at 552, 568. The case makes no mention of Getty's contributor platform.[11]

Shutterstock, by contrast, is an intermediary as the DMCA contemplates. Contrary to Appellant's outlandish suggestion that Shutterstock has raided two million contributors' computers to decide what images to add to its platform (*see* Br. 16), Shutterstock had ***no*** involvement in choosing which images to upload from contributors' computers: the contributors who uploaded Appellant's claimed images did. A.239 ¶ 7. Shutterstock does not create its own images to sell or license on the contributor platform. A.239 ¶ 9. It does not take ownership (or even any exclusive license) of images. A.239-40 ¶¶ 9, 13. The record is undisputed that

---

[11] Appellant's assertion that Getty was found "ineligible for the safe harbor" (Br. 41, n.5) is not true. *See Morel*, 934 F. Supp. 2d at 567 (finding "*an issue of fact* regarding whether Getty qualifies as a service provider") (emphasis added). Of course, the fact that Shutterstock *also* has a traditional licensing platform similar to the Getty platform at issue in *Morel* does not mean that Shutterstock is not entitled to DMCA protection for its contributor platform. Likewise, Appellant's misrepresentation (Br. 41) of *Michael Grecco Prods., Inc. v. Alamy, Inc.*, 372 F. Supp. 3d 131 (E.D.N.Y. 2019), is off-base. *Id.* at 140 (denying Rule 12(b)(6) motion to where image was provided by *plaintiff*, not a third-party contributor). Appellant also cites *Gardner v. CafePress Inc.*, No. 13-CV-1108-GPC-JMA, 2014 WL 794216 (S.D. Cal. Feb. 26, 2014), another roundly rejected case which the *Zazzle* court refused to follow because its suggestion that protection is lost where products are sold is inconsistent with the DMCA. *Zazzle*, 2017 WL 2729584, at *7. And *Playboy Enters, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543 (N.D. Tex. 1997), *aff'd*, 168 F.3d 486 (5th Cir. 1999) (per curiam), was decided before the DMCA was enacted, and its one-sentence affirmance does not suggest any consideration thereof.

there is no material "vetting": just like YouTube and Vimeo, anyone can become a

contributor if they agree to the terms of service, supply contact information for

payments, and have not been previously terminated for policy violations. A.238

¶ 4. The system is driven by automatically-applied templates and pricing, and the

contributor's offering on the platform does not change based on who a contributor

is or what images he supplies. A.241-42 ¶ 18. Shutterstock did not engage in

discussions with any prospective licensees as to any party's images: the licensees

for the uploaded images independently chose what they wanted from the array on

the platform. *Id.* Contributors can choose to remove their images from sale or

license via competitors simultaneously. A.252 ¶ 50; A.2088-89 ¶ 29. All of this

falls well within the plain language of the DMCA and the case law recognizing its

broad definition of "service provider."

> **2.** **Contributors Submitted Images to Be Hosted on Shutterstock's Systems—Exactly the Activity Section 512(c) Contemplates—Which Was the Cause of the Alleged Violations Appellant Complains About Here.**

As was undisputed below, a contributor uploads their chosen image(s) to the

contributor platform, which is a "third party" vis-à-vis the contributor. Unless

blocked, the platform automatically creates low-resolution thumbnail versions of

the image which are watermarked to prevent copying and enables an authorized

third party to access the original image, as is the contributor's wish. *See* SPA.2-4.

The images are available because the contributor has directed that it be so, by

reason of their decision to upload them to Shutterstock's (a third party) systems. This is exactly "storage at the direction of a user [the contributor] of material that resides on a system or network controlled or operated by or for the service provider," *i.e.*, Shutterstock's contributor platform. 17 U.S.C. § 512(c)(1).

Appellant tries a multitude of theories to try to take Shutterstock's platform down and outside the protection of the DMCA, where it has remained generally undisturbed in the 20-plus years of its existence. This heart of Appellant's brief (Br. 14-28) relies on misrepresentation of the record, authorities that have nothing to do with the DMCA, and misuse of those that do. And Appellant's speculation about the platform's structure and conflation of Shutterstock with licensees fails to impact the simple fact that the Contributors submitted the Images to be hosted on Shutterstock's systems. Contributors know that their submission includes providing access to prospective licensees—and in thumbnail fashion to Shutterstock affiliates via the API—to get access to the images hosted on the "system or network" controlled by Shutterstock. *See* A.240 ¶ 12; A.256-57 ¶¶ 63-65. This is what Section 512(c)(1) says, and is all that is necessary to meet the test as a matter of law.

a. **Contrary to Appellant's claim about bulletin boards, this Circuit has held repeatedly that providers with roles in the operation of their systems are covered by the DMCA.**

Shutterstock's contributor platform falls well within the letter and spirit of the DMCA. First, the user directs the material: it exists on the platform because the contributor submitted it to the platform and *wants* it to be there, in the form that Shutterstock's automated system sets it up for access by third parties, including with the automated formatting, pricing, and API availability that the platform applies to every image that contributors upload. A.261-62 ¶¶ 14-16; A.271 ¶ 71. *See, e.g.*, *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1012, 1016, 1019-20 (9th Cir. 2013) (defendant's use of "access-facilitating processes that automatically occur when a user upload[ed] a video," including making four copies of video in various formats, did not disqualify it from Section 512(c) safe harbor); *Viacom*, 676 F.3d at 28, 38-39 (similar).

Appellant's clinging to an overstated description of *BWP Media USA Inc. v. Polyvore*, 922 F.3d 42 (2d Cir. 2019), which expressly recognized the just-cited point from *UMG Recordings* (*id.* at 58), is misplaced accordingly. There, the Circuit panel *per curiam* found that there was an issue of fact pertaining to creating *unexplained* copies of images that were not requested by platform users, and which were housed and displayed in different locations than what the user requested. *Id.* at 58-59. But, as Judge Rearden pointed out when Appellant tried to

25

make the same argument below (SPA.15-16), on a much more developed record, the reasons are clear: any copies were all available at a single asset detail page, associated with a single URL, to permit viewability by the potential licensee. *See, e.g.*, A.241 ¶ 16; A.252 ¶ 50 (discussing purposes of thumbnails); *cf. Polyvore*, 922 F.3d at 59 (remanding specifically due to defendant's failure to identify purpose or function of copies).[12]

Second, Appellant claims that the system must be ***solely*** a storage locker and cannot have any other features, processing, or connectivity. Not so. All of this is exactly what this Circuit and the Ninth Circuit recognize ***is*** permissible within the safe harbor. *See Viacom*, 676 F.3d at 38-40 (noting limitations in Section 512(a) are not applicable in Section 512(c) and finding that modification of user-submitted material, including transcoding and playback, falls within Section

---

[12] The two purportedly "unique URLs" refer to the asset detail page, which is a template at which an image appears in various thumbnail/watermarked forms, and a URL inaccessible to most parties, ending in .jpg, for purposes of hosting and storage. A.245-46 ¶ 31; SPA.16 (posted so that the potential licensee "can get a sense of how the image might look"). Like in *UMG Recordings* and unlike in *Polyvore*, each serves an identified purpose, and the two are interrelated as part of the basic functionality of the overall system. SPA.15-16. Appellant's claim that reviewers are involved in the creation of these thumbnails is false; the process is entirely automated and uniform across all of the images made available for license on Shutterstock's website. A.241 ¶ 16.

512(c)); *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 607 (9th Cir. 2018) (citing *Viacom* favorably).[13]

With the law failing to support him, Appellant tries to change the facts. Yet he fails to cite any facts supporting his specious claim (Br. 17, 18) that Shutterstock has the ***only*** role—including to the exclusion of the contributors themselves—in the appearance of images on the contributor platform, or that Shutterstock picks how content will be made available or otherwise engages in any volitional act other than blocking (Br. 21). There are no such facts. SPA.14-15. Likewise, Appellant's suggestion that a handful of independent contractors delicately review, manually create copies from, carefully select, and then continue to attend to hundreds of millions of images, which arrive at a rate of roughly 200,000 per day, reflects not only a technological and operational impossibility but blatant disregard of the facts that Appellant admittedly could not dispute with anything but conjecture and mischaracterization. SPA.15 (in response to Appellant's allegations regarding purported curation and control, stating, "[t]hat is not, however, what [Appellant's] evidence shows."); A.278-79 ¶ 10. Appellant's regurgitation of unsupported material fares no better on appeal. Indeed, the citations to inapplicable material, including material ***entirely unrelated*** to the

---

[13] Appellant's quotation (Br. 18) from *Sid Avery & Assocs., Inc. v. Pixels.com, LLC*, 479 F. Supp. 3d 859, 866 (C.D. Cal. 2020), is from a section that is not related to the DMCA; it discusses the meaning of "volitional conduct."

27

contributor platform, only shine a spotlight on Appellant's desperation to make the platform something it is not.[14]

The case that Appellant cites in talismanic fashion—the Ninth Circuit decision in *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045 (9th Cir. 2017)—**supports** Shutterstock's position. Consistent with prior precedent, *Mavrix* expressly recognizes that the scope of activity within the safe harbor is not limited only to "access-facilitating" processes: protection goes well beyond storage. *Id.* at 1052. As the Ninth Circuit noted, screening briefly for "infringement or other harmful material" (as Shutterstock does here) before it is available to a third party to find, can be accessibility-enhancing and thus does not take the service provider outside of the safe harbor. *Id.* at 1056.[15]

---

[14] Appellant quotes *Viacom* for its claim that content is stored "at the direction of the user" only when the process is "fully automated" and has no employee involvement (*see* Br. 16), but that is not what the section of *Viacom* at the citation says. Rather, the language refers to particular functions that were sufficiently related to the core storage activities of Section 512(c). *See Viacom*, 676 F.3d at 40 ("the indexing and display of related videos retain a sufficient causal link to the prior storage of those videos"). So too here.

[15] *Mavrix* is inapposite. There, the question was whether a publisher of news material was liable for its employees' activities. *Mavrix*, 873 F.3d at 1052. In contrast with Shutterstock's quick screening for policy violations, Appellant admits that the employees in *Mavrix* studied each submission and rejected two-thirds of them, ensuring that "only those posts relevant to new and exciting celebrity gossip [were] approved." Br. 38 (quoting *Mavrix*, 873 F.3d at 1056). Because the district court in *Mavrix* failed to consider this extensive review and curation in its DMCA analysis, the case was remanded. *See Mavrix*, 873 F.3d at 1056-57; *see also Downs v. Oath Inc.*, 385 F. Supp. 3d 298, 304 (S.D.N.Y. 2019)

Moreover, as in all the cases cited herein granting summary judgment to the defendant on the service provider question, the record is clear that Shutterstock does not decide or otherwise "direct" image submission. Its review is exactly the opposite: it determines what images that the user uploads are **blocked** for violation of Shutterstock's policies. A.260-61. Nor do Shutterstock reviewers decide what content a licensee might want to use.

Another key problem with Appellant's suggestion that a provider must have no role is that it would require the Court to ignore Section 512(m), which recognizes good-faith efforts to reduce infringement whether or not the copyright owner has provided notice. *See* 17 U.S.C. § 512(m). Despite insisting that the Court must be faithful to the statute, Appellant ignores this section, even expressly conditioning the DMCA's applicability on the absence of preventing violations or taking other steps to create a safe space for users and those with whom those users connect. Br. 17-18. Others who have tried to similarly disregard this provision have found themselves without recourse, and Appellant has provided no reason why Section 512(m) should be read out of the statute here either. *See Viacom*, 676 F.3d at 35 (safe harbor not conditioned on provider's monitoring); *Ventura Content, Ltd. v. Motherless, Inc.*, No. 11-CV-5912-SVW-FMO, 2013 WL

---

(distinguishing *Mavrix*). Appellant has never cited any evidence to support his analogy to *Mavrix*.

11237204, at *2 (C.D. Cal. July 3, 2013) (defendant entitled to Section 512(c) safe harbor even though it "employs its own review process designed to ensure that uploaded content does not violate its terms of use"), *aff'd*, 885 F.3d 597 (9th Cir. 2018); *Costar Grp. Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 692 (D. Md. 2001) (same, even though photo "is not immediately available to the public," but first "reviewed by [an] employee" for the nature of the photo's content and to ensure "there is no obvious indication" that it "violat[es] [defendant's] terms and conditions"), *aff'd*, 373 F.3d 544 (4th Cir. 2004).[16]

      **b.**    **There is no "carve-out" in the DMCA safe harbor for particular copyright rights or particular copyright violations.**

For the first time, Appellant speculates in various places that particular Section 106 rights are purportedly not covered (reproduction rights, derivative work rights, display rights, etc.) within the safe harbor. *See* Br. 22, 24. Had he raised this argument below, the District Court would have rejected it: it fails *ab initio* because it requires that the Court ignore that the DMCA safe harbor relates to "copyright infringement" generally—not just certain types of copyright infringement, or infringements made by specific users and not by automated

---

[16] Shutterstock's cursory review involves identifying policy violations on many levels. The suggestion that a contractor gives thoughtful consideration to style or aesthetics was never supported. *See* A.284 ¶ 18.

aspects of the service provider's system. *See* H.R. Rep. No. 105-551, pt. 2, at 50 (1998) (describing "infringement" without caveats).[17]

Appellant cites no authority for his limitation theories. As noted above, Congress recognized that infringements in *whatever form* are covered in the safe harbor if the conditions of Section 512 are met, as they are here. The district court cases that Appellant cites do not support the theory that only a single copy of an image can be made at any time in the process.[18] Nor would they overcome this

---

[17] Appellant argues that adding a watermark to an image turned it into a derivative work (Br. 23-24, 26), even though such argument failed below on unrebutted law. *See Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 210 F. Supp. 2d 147, 158 (E.D.N.Y. 2002) (changes not requiring "'artistic' skill" do "not merit protection as a derivative work"), *aff'd sub nom.*, 354 F.3d 112 (2d Cir. 2003) (citation omitted). The one case that Appellant cites for this point (Br. 26) is inapposite. *See Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) (syllabus incorporating prior material was sufficiently original to qualify as a separately-copyrightable derivative work). Further, while the District Court did not need to reach the issue and Appellant does not argue to the contrary now, the thumbnails are not created volitionally and are fair use even if they could be argued to be so. *See* A.262 ¶¶ 16-17; *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (holding defendant's use of the plaintiff's copyrighted images as "thumbnails" in its online search engine was a "transformative" fair use).

[18] Appellant's citations (Br. 24, 25) to *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, No. 18-CV-3403-SAG, 2021 WL 5359671, at *19-20 (D. Md. Nov. 17, 2021), refer to the difference between the distribution right and a so-called "making available" right. *Id.* Section 512 is not mentioned in the ruling at all. Similarly unpersuasive is *Rock River Commc'ns, Inc. v. Universal Music Group, Inc.*, No. 08-CV-635-CAS-AJW, 2011 WL 1598916, at *16 (C.D. Cal. Apr. 27, 2011), which Appellant cites repeatedly but which concerns Section 512(f). *See id.* Neither case stands for the propositions for which they are cited either.

Circuit's approval of DMCA protection for systems that necessarily involve multiple copies and rights, such as the reproduction right, the synchronization right (within the right to prepare derivative works) and the performing right present in the video services YouTube and Vimeo, which both have been found to fall within the protection of the Section 512(c) safe harbor. *See Viacom*, 718 F. Supp. 2d at 518; *Vimeo*, 826 F.3d at 99.

Moreover, Appellant's theories, again, incorrectly depend on disregarding how the platform operates: unquestionably, the types of platforms that the DMCA contemplated, like Shutterstock's automated contributor platform (and many others), are protected by the DMCA. There is *no* intentionality and nothing in the record that indicates that Shutterstock has any intention with respect to any particular image. To the contrary, the *contributor intends* to upload the materials she chooses; the *licensee intends* to license the materials that he chooses from the contributor platform. A.239 ¶ 7; A.241-42 ¶ 18. The *only* evidence in the record of *any* intention on Shutterstock's part is the intention to keep the platform free of problematic or offensive material. As noted above, this is not only permissible, but encouraged by black-letter law and policy underlying the DMCA itself.

### c. What others may have done with the images is irrelevant to the question of Shutterstock's liability.

Finally, Appellant claims that because licensees obtained allegedly infringing material that they may or may not have used for purposes that might be infringing, the DMCA does not apply. In fact, the first of his two questions presented for appeal seems to suggest that if there is a customer on the end of the transaction and that customer acquires or otherwise consumes the uploaded material, then not only can the plaintiff sue the customer, he can sue the platform over the same use, too. This is meritless.

Appellant cites no authority for the concept that the material must reside *solely* on Shutterstock's systems, and users cannot make use of the material through their own acts, because there is no such authority. The DMCA does not state that processing or storage of material, which was problematic via a causal nexus to the uploading by a user, is no longer within the DMCA's scope because the material then makes its way elsewhere by viewing or transmission otherwise. When not losing the forest for the trees, a proper analysis looks at the black-letter law memorialized in the DMCA rather than trying to add in conditions or caveats that are not in the statute. Accordingly, infringing material may be sent to an eBay

or Amazon customer, or may be stored on a YouTube viewer's computer or smartphone, and yet the system is protected. *See supra* at 20.[19]

Appellant's complaints that a small handful of Licensees used the Images they obtained via Shutterstock miss the mark. He suggests that he should be able to sue **twice**, thereby double-dipping for a use that is independently actionable and may give rise to joint and several liability if requisite legal elements exist. The courts have made it clear to Appellant that this is impermissible. *See McGucken v. Lonely Planet Global, Inc.*, No. 22-CV-5476-DMG-SKX, 2023 WL 4206107, at *3 (C.D. Cal. May 11, 2023) (citing *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1265 (9th Cir. 2021) ("for any two or more jointly and severally liable infringers, a plaintiff is entitled to one statutory damage award per work")). Appellant omits that he can separately pursue claims against these innocent Licensees (who are not eligible for the DMCA)—and that, consistent with his business model, he already has sued several of these Licensees for $150,000 each even though they had no reason to know that the Images they downloaded from

---

[19] The reference to YouTube's syndication of 2,000 manually-chosen videos to be sent to Verizon for syndication bears no resemblance to the fact that here, *every* image that is not blocked is available to *every* prospective licensee. *Compare Viacom*, 676 F.3d at 40. As the District Court correctly found, the API User Platforms direct potential licensees back to Shutterstock's platform, and Appellant's suggestion to the contrary (Br. 28) is false. SPA.18; A.255-56 ¶¶ 60, 63-64.

Shutterstock were unauthorized.[20] *See* Br. 28, n.3. Whatever claims Appellant may have against the Licensees, he cannot bootstrap them onto this case.

### C. The District Court Correctly Found that the Three Conditions for Entitlement to the Safe Harbor Apply.

The record below showed as a matter of law that Shutterstock had no actual knowledge of the alleged infringement, except with respect to the one Noticed Image, which Shutterstock promptly disabled from the noticed locations, plus the 336 Images that already had been removed prior to their reference in the lawsuit. SPA.16-18; A.247 ¶ 34. The record also showed that Shutterstock rarely receives notices of any kind in connection with the millions of contributor-supplied images on its platform (A.244 ¶ 27), and the revenue attributable to the licenses was extremely small, particularly after payment to the Contributors. SPA.6. Shutterstock also had no ability to control the uploader or the licensee, other than terminating the uploader and notifying the licensee of the claim, neither of which constitutes "control" as a matter of law in any event. SPA.19; A.239 ¶ 7; A.243 ¶ 25; A.254 ¶ 59; *Viacom*, 676 F.3d at 38 (removing or blocking access insufficient

---

[20] In one of the cases, the Licensee downloaded the Image in late January 2021 and included it within a 672-page book, a situation that could have been avoided entirely had Appellant timely sent notice as to just one other Image in the Hane Street account. Appellant offers no support for his assertion (Br. 27, 29) that his Images have been subject to "massive piracy," appearing on hundreds of websites and products" and "major retail products sold on Amazon and at Walmart."

for "control"). Accordingly, the three conditions for safe harbor eligibility set forth in Section 512(c)(1)(A)-(C) are satisfied as a matter of law. SPA.16-19.[21]

## 1. Appellant *Ensured* that Shutterstock Would Not Be Aware of All but One of the Uses.

Appellant was aware that Shutterstock had millions of assets on its platform, and as of late 2020, that a third-party Contributor, Hane Street, was offering more than one of the Images at issue via Shutterstock's platform. A.266 ¶ 44. But as the District Court found on unrebutted evidence, Appellant provided no notice to Shutterstock beyond the one Noticed Image, which Shutterstock promptly removed, and there was no evidence that Shutterstock had any knowledge (from Appellant or otherwise) that the other 336 Images were infringing prior to filing suit. SPA.16-17. His declination to notify Shutterstock (A.266-68 ¶¶ 44, 49, 51) "stripped [him] of the most powerful evidence of a service provider's knowledge." *UMG Recordings*, 718 F.3d at 1020-22.

Appellant speculates (Br. 37) about Hane Street, but the record is clear. Shutterstock terminated Hane Street's account and disabled all of the images—including the Images at issue in this case—upon receipt of a second complaint, and before Appellant first identified them to Shutterstock by suing. A.267 ¶ 46; A.248

---

[21] Appellant no longer argues that Shutterstock did not have a designated agent or that its DMCA notice as to the one image was not compliant. *See* 17 U.S.C. § 512(c)(2), (3).

¶ 38. As noted in Appellant's oft-cited case *Polyvore*, "the fact that [Appellant] filed a lawsuit before simply asking [Shutterstock] to take [his] images down suggests that [Appellant] has a business model that involves abusing the federal courts." 922 F.3d at 59 (citation omitted); *see also* A.1757-60; A.2383-92 (supporting attribution of Appellant's inaction to the fact that he has greater success in litigation than licensing). This turns the purpose of the DMCA—to eliminate litigation and liability—on its head, dragging Shutterstock through litigation baselessly.[22]

On appeal, Appellant argues (Br. 30) that Shutterstock had the requisite "red flag knowledge" because, regardless of whether Shutterstock received notice, it should have known that other contributor-submitted photographs were his. This argument fails, too. First, contrary to Appellant's suggestion (Br. 34), it is ***not*** Shutterstock's burden to "prove it was unaware" of the infringement. *See Vimeo*, 826 F.3d at 95 ("[T]he burden falls on the copyright owner to demonstrate that the service provider acquired knowledge of the infringement[.]"). Second, there is no support for Appellant's assertion that Shutterstock must be intimately familiar with the rights, permissions, and relationships of its two million contributors (many of

---

[22] Appellant does not dispute that Shutterstock had a proper DMCA agent at all times (SPA.19) and promptly disabled the Noticed Image upon receiving notice (SPA.17). Nor does Appellant contest anything with respect to the "server" copies, which were not visible on Shutterstock's customer-facing website.

whom are represented by agents) and any affiliated brand names.[23] The precedent that Appellant cites, even if it were binding on this Court, is to the contrary. *See, e.g.*, *Ventura*, 2013 WL 11237204, at **6-7 (for "red flag knowledge," record must establish "the provider was *subjectively aware* of facts that would have made [it] '*objectively*' *obvious* to the service provider that the *specific copyrights owned by the* [*p*]*laintiff* were being infringed") (emphasis added); *see also Viacom*, 676 F.3d at 31 ("whether the provider actually or 'subjectively' knew of specific infringement"); *Vimeo*, 826 F.3d at 94, 97  (no "red flag knowledge" even if service provider's employee viewed allegedly infringing content containing "a ['recognizable'] copyrighted [work]," because employee is not expected to know if the use was authorized or fair). Moreover, because any incoming metadata automatically is separated out from the image first (A.2082-83 ¶ 15(c)), the reviewers did ***not*** review any such metadata, as Appellant falsely asserts, but merely reviewed the name, title, and keywords that the contributor supplied. A.251 ¶ 49.[24]

---

[23] Appellant, for example, purportedly offers his photographs under two aliases. An online search for one such name, "45SURF," leads to https://45surf.smugmug.com/,which primarily features photos of "bikini models," not landscapes.

[24] The House Report that Appellant cites does not identify metadata. *See* Br. 35 (quoting and misconstruing H.R. Rep. No. 105-551, pt. 2, at 25 (1998)).

Appellant also rehashes his effort to pin compliance on API User Platforms who evidently did not refresh their cache when the Images were disabled at the source. The District Court correctly rejected this argument. SPA.18. Appellant's speculation (Br. 36) that a platform must investigate what the Licensees did (if anything) with the Images similarly is unsupported. What a service provider must do is stated in the statute, and Shutterstock did it.

Logically, if Appellant truly wanted to stop the use of his Images, he at least would have sent a notice to Shutterstock about the other Images. But, similar to the professional litigant in *Polyvore*, Appellant evidently has other goals. Appellant's inexplicable failure to follow the notice provisions of the DMCA cannot shift liability to Shutterstock.

### 2. Shutterstock Never Received a Financial Benefit from the Allegedly Infringing Activity and Had No Right or Ability to Control in Any Case.

As this Circuit has explained, the "'right and ability to control' infringing activity under § 512(c)(1)(B) 'requires something more than the ability to remove or block access to materials posted on a service provider's website[,]'" such as exerting "*substantial influence* on the *activities* of [its] users." *Viacom*, 676 F.3d at 38 (cleaned up; emphasis added); *accord Wolk*, 840 F. Supp. 2d at 747-48. The District Court correctly found that "[t]he undisputed facts show that [Shutterstock] had no [such] right [or ability] to control the initial infringing conduct by the

Contributor[s]," notwithstanding the fact that "images are subject to review by Shutterstock before they are ingested into the platform." SPA.19.

Appellant again misrepresents Shutterstock's review of contributor-submitted images. But is undisputed that Shutterstock briefly screens solely for policy violations (A.239-40 ¶ 10), and does not substantively modify content or provide "extensive advice" (A.239-40 ¶ 7)—nor could it given the volume of contributor-submitted images Shutterstock receives (A.239 ¶ 8). *See Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1153 (N.D. Cal. 2008) (no "right and ability to control" where defendant "received hundreds of thousands of video files from users"); *see also* SPA.19 (rejecting Applicant's allegations, such as Shutterstock's blog posts for contributors and the existence of policy violations, as unsupported and irrelevant to control).[25] Nor does the DMCA prohibit a platform from marketing its own services, as Appellant suggests. The conditions are clear and unqualified.

Appellant again tries again to pick and choose material from other lines of business, or from a time when Shutterstock's contributor platform had 1.75% of

---

[25] Appellant's reliance on *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009), (Br. 30), is misplaced. In *Arista*, there was "no dispute that [d]efendants' services were used overwhelmingly for copyright infringement[,]" with "over 94% of all content" deemed likely or actually infringing. *Id.* at 131. Likewise, Appellant's analogy to a pleading-stage case involving a photography agency whose employees worked closely with contributors to decide what content to include is inapt. Br. 30-31 (citing *Alamy*, 372 F. Supp. 3d at 140).

the contributors it had at the time of suit, but this effort fails as it did before. SPA.2 n.1 (rejecting invocation of inapplicable and outdated materials). The District Court expressly found, *on the correct record*, that Shutterstock does not have the requisite "right and ability to control" simply because it operates and polices its platform.

While this finding could end the inquiry, Appellant also fails to establish the other required element of direct financial benefit. Appellant ignores the law of this Circuit and others in pointing to the $2,131.60 revenue generated from the licenses of the Images and the hypothetical subscription revenues which were never established in evidence. What is relevant are the undisputed facts that the Images were offered at the same prices and on the same terms as all of the millions of authorized contributor-submitted images available on its platform. A.254 ¶ 57; *see, e.g.*, *Viacom*, 718 F. Supp. 2d at 521 (element fails where service provider is "conducting a legitimate business" and "the infringer makes the same kind of payment as non-infringing users of the provider's service."); *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 645 (S.D.N.Y. 2011) (same, where "infringing and noninfringing users [ ] paid precisely the same or nothing at all").[26]

---

[26] Appellant obfuscates the numbers in effort to make the extent of use appear greater than it actually was. Of the 337 Images at issue, 172 were never licensed. A.254 ¶ 58. The licenses involved only 165 of the Images and generated a total of $2,131.60 in revenue, part of which was paid to the Contributors. A.254 ¶ 56. Sixty-five of the licensed Images generated no revenue. *Id.*

Fundamentally, there is no dispute that Shutterstock's contributor platform is a draw for **legitimate**, **non-infringing** material. A.242 ¶ 20; A.244 ¶ 28; *see Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (no "direct financial benefit" because no evidence infringement was a draw); *Wolk*, 840 F. Supp. 2d at 748 (same, where "profits are derived from the service" in general); *compare with Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1045 (9th Cir. 2013) ("direct financial benefit" where most content was infringing and defendant *specifically promoted* it to draw customers). Shutterstock not only promotes its platform as a resource for authorized content, but it stakes its own integrity and profits on the integrity of the uploaded content. A.244 ¶ 27.

### D.  The District Court Correctly Found that Shutterstock Meets the Other Threshold Requirements for Safe Harbor.

Having established itself as a "service provider," Shutterstock remains eligible for safe harbor provided it (1) has adopted and reasonably implemented a policy for terminating repeat infringers; and (2) does not interfere with "standard technical measures." 17 U.S.C. § 512(i). The District Court correctly found that Shutterstock meets these requirements.

### 1.  Shutterstock Has Adopted and Implements a "Repeat Infringer" Policy.

The District Court properly held, consistent with *Steinmetz*, that Shutterstock "has 'adopted,' 'informed users of,' and 'implemented a repeat infringer policy' in

compliance with 17 U.S.C. § 512(i)(1)(A)." SPA.11. Shutterstock indisputably has policies for takedown notices and repeat infringers on its website, and regularly terminates contributors' accounts and removes content due to alleged infringement. A.242-43 ¶¶ 21, 25-26. This is enough to satisfy this element. *See, e.g.*, *Wolk*, 840 F. Supp. 2d at 744.

Appellant's sole argument to the contrary—that Shutterstock failed to promptly terminate Hane Street (Br. 44-45)—is wrong on the facts and the law. As discussed *supra*, Shutterstock terminated Hane Street's account after the second complaint, which is more than the DMCA requires. *See, e.g.*, *Disney Enters., Inc. v. Hotfile Corp.*, No. 11-CV-20427, 2013 WL 6336286, at *21 (S.D. Fla. Sept. 20, 2013) (DMCA does not require "a perfect policy []or even anything as stringent as [a] three-strikes policy"). In any event, the "repeat infringer policy requirement does not focus on the particular infringement at issue," but instead "addresses how the site is generally managed." *Ventura*, 885 F.3d at 614.[27]

### 2. Shutterstock Does Not Interfere With "Standard Technical Measures."

This requirement easily is met because there are no "standard technical

---

[27] The fact that Shutterstock has been sued in other infringement lawsuits (Br. 45) is irrelevant and misleading. Shutterstock has never been held liable for infringement. A.311 ¶ 53. In one such lawsuit, the court dismissed the infringement claims against Shutterstock as a matter of law and awarded Shutterstock its costs. *Steinmetz*, 629 F. Supp. 3d at 85.

measures" under 17 U.S.C. § 512(i)(2). The requisite "standards process" has never occurred. *Cf.* Standard Technical Measures and Section 512: Notification of Inquiry, U.S. Copyright Office, 87 Fed. Reg. 25,050 (Apr. 27, 2022). Appellant points to Shutterstock's so-called "stripping" of his photographs' metadata (Br. 46),[28] but as the District Court properly observed, Appellant "has not come close" to establishing that his proposal about metadata is a "standard technical measure." SPA.12 (citations omitted); *accord Polyvore*, 922 F.3d at 44, 56, n.9 (Newman, J. concurring) ("[plaintiff] has the burden" and "has not shown that [defendant's] stripping of metadata" is a "standard technical measure"); *Wolk*, 840 F. Supp. 2d at 745 (providing tools to edit watermarks did not interfere with "standard technical measure"). The articles that Appellant cites (Br. 45, n.6) do not bring him any closer to sustaining his burden to show that preserving metadata constitutes a "standard technical measure." *See, e.g.*, *Polyvore*, 922 F.3d at 56 (industry guidelines document "wholly deficient in establishing that preserving metadata is 'standard'").[29] Thus, Shutterstock is eligible for safe harbor.

---

[28] Applicant's terminology is misleading. As discussed *infra* Part III.B, Shutterstock does not "strip" metadata, but rather, consistent with industry practice, its system automatically separates metadata embedded in contributors' images during the ingestion process for legitimate reasons. A.261 ¶ 15.

[29] Appellant's reliance on *Gardner* is unfounded (*see* SPA.13, n.7), including because it is *dicta* and there was no indication that use of metadata was a "standard technical measure." Appellant's claim that metadata may be used by photographers to protect their work and may constitute "copyright management information" within the meaning of Section 1202 (Br. 45-46 (citations omitted)),

### E.     A Circuit Split Would Occur Only if the Decision Below Were Reversed.

Appellant's warning of a circuit split is hollow. Appellant again cites *Mavrix*, which not only is factually distinguishable (*see supra* n.15), but also suggests that summary judgment may have been granted for defendants if the record had been complete, and approvingly cites cases that held that platforms like Shutterstock's were entitled to safe harbor. *See Mavrix*, 873 F.3d at 1052-53, 1057-58 (citing *Corbis* and *UMG Recordings*, which itself relied heavily on *Viacom*).

*Mavrix*'s coexistence with several Ninth Circuit decisions that Shutterstock cites as favorable demonstrates that there is no split within the Ninth Circuit, nor with this Circuit. Indeed, *Mavrix* restated what the Circuit held in *UMG Recordings*, finding the safe harbor applies where, as here, all user submissions were reviewed and approved if no policy violation was found. *Ventura*, 885 F.3d at 606-08 (citing Second, Fourth, and Tenth Circuit decisions in finding service provider is protected by the DMCA as a matter of law where users decide what to post, subject to exclusions for policy or legal violations).[30] Given the material

---

has no bearing on whether the removal of metadata constitutes a "standard technical measure" for purposes of DMCA safe harbor eligibility.

[30] Appellant's citation (Br. 39) to a case in Illinois, which notes "extensive, manual, and substantive activities" are required to take a party outside of DMCA protection, appears to underscore Shutterstock's points rather than suggest a split. *Roadget Bus. Pte. Ltd. v. PDD Holdings Inc.*, No. 22-CV-7119, 2023 WL 4865005, at *9-10 (N.D. Ill. July 31, 2023) (quoting, *inter alia*, *Mavrix* and noting

differences in *Mavrix* from all of the cases cited in *Ventura*, which cases are far more similar to the facts at bar, reversal here would create a circuit split with at least three circuits, and would violate principles of *stare decisis* pertaining to other platforms such as YouTube and Vimeo—cases in which those parties were less diligent and offered more features on their platforms than what the record shows with respect to Shutterstock's contributor platform. Appellant offers no explanation as to how *Viacom* and *Vimeo* could stand if the District Court's decision were reversed.

F.   **None of Appellant's Policy Arguments Warrants Upending Longstanding U.S. Law or the International Treaties that the DMCA Tracks.**

At the end of Appellant's fragmented argument, he leans into "policy." Br. 47-48. He begs this Court to hold contributor platforms strictly liable for up to $150,000 per work, regardless whether a copyright owner provides notice or not, effectively making such platforms impossible to operate. *Id.* This is exactly what platforms feared and why Congress stepped in to ensure they would not be held liable for third-party abuse. *See* S. Rep. No. 105-190, at 2 (1998); H.R. Rep. No. 105-551, pt. 2, at 50 (1998).

---

defendant's failure to rebut allegations pertaining to extensive control beyond that of competitors).

Taking Appellant's theory to its conclusion reveals a troublesome result. According to Appellant, contributor platforms like Shutterstock's should not exist, leaving contributors without an easy way to offer their works and the public without an easy way to license them, and copyright owners should not have to assert their rights. This would only increase the amount of infringement and cannot be squared with the purpose of the copyright law, which is designed to encourage the creation and dissemination of works for the public's benefit. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985). Likewise, the DMCA is built on cooperation and, applied here, safeguards platforms that connect creators with and potential licensees. Appellant does not explain how any "policy" would be furthered by the obliteration of platforms like Shutterstock's, when the problem he complains of could have been prevented or at least addressed with a simple notice. Nor does he explain why Shutterstock would want infringing works on its platform in the first place, given that its goal is to provide creators with a way to efficiently and safely make their own works available for license. As noted, Shutterstock not only has an incredibly strong track record of non-infringement, but it goes above and beyond in removing any questionable material even before, as here, it is properly notified or sued. A.266-68 ¶¶ 45-46, 50.

In any event, policy arguments are not a basis for a lawsuit and have no place here. Tellingly, no *amici* in the photography field or otherwise have come to

47

Appellant's aid, despite Shutterstock's blanket consent. Indeed, the ruling below comports with the expectations of Shutterstock's competitors, such as Getty and Adobe, both of which operate contributor platforms akin to Shutterstock's in reliance on the DMCA. A.2079 ¶ 9. Accordingly, deference to the DMCA, and the Second Circuit's interpretation thereof, is critically important. *See, e.g.*, *Republic of Austria v. Altmann*, 541 U.S. 677, 693 (2004) (predictability and stability are matters of prime importance in considering property rights). Thus, if policy is considered, it favors affirmance.

### G. Appellant's Belated Request for Prospective Injunctive Relief Directly Conflicts with the DMCA and Second Circuit Law.

The DMCA has built-in injunctive relief: where the service provider receives notice of infringement, it must remove or disable the identified material. *See* 17 U.S.C. § 512(c)(1)(A)(iii). The DMCA does not require that a service provider then become an expert in the millions of pieces of material on its site, as well as in the images in the portfolio of a plaintiff who makes hundreds of thousands of landscape images available online and unlocked, and require the service provider to screen for any such images going forward. As much as Appellant may resist, the onus is on the copyright owner to police and send notice. *Ventura*, 885 F.3d at 603 ("The [DMCA] places the burden of policing copyright infringement on the copyright owner, not on the person or firm storing and hosting the material.") (citation omitted). Appellant cites no authority that because he sent

48

one notice as to one image posted by one contributor, he would be entitled to any sort of injunction as to whatever may get uploaded to the contributor platform by anyone at any time. Moreover, the claim that he can now get prospective relief for un-noticed material when past relief is barred is unexplained, circular, and self-contradictory.

Furthermore, there is no need for the order that Appellant requests. *See* Br. 62. It is clear that Shutterstock already removed all of the Images from its website, which automatically caused them to become inaccessible via the API User Platforms, and also terminated the Contributors. A.266-68 ¶¶ 45-46, 50; A.271 ¶ 75. To the extent any Images remain available via the API User Platforms and/or Licensees, Appellant should say something to them. *See Polyvore*, 922 F.3d at 59. Shutterstock has no right or ability to control these third parties nor any ability to remove any lingering Images from the third-party websites, as they are not stored on Shutterstock's servers. A.255-57 ¶¶ 62, 65-67.[31] The only case that Appellant cites confirms that the requested "order requiring removal of [the alleged] infringing content" is not warranted in these circumstances. Br. 61-62 (citing *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1235 (D.C. Cir. 2003), in which the court quashed a subpoena requiring Verizon to

---

[31] Appellant points to two allegedly continuing uses. Br. 62, n.10. Shutterstock sent "kill notices" to both Licensees on June 3, 2022 and has no ability to remove the Images from these third-party websites. A.254 ¶ 59.

"remove or disable access to the infringing material" because "that material [was] not stored on [its] servers").

## II. SHUTTERSTOCK'S SATISFACTION OF THE DMCA ELEMENTS CONFIRMS IT COULD NOT BE LIABLE FOR CONTRIBUTORY OR VICARIOUS INFRINGEMENT

Appellant claims that the District Court erred "by failing to rule on two of the three causes of action at issue." Br. 56. Such claim reveals a misunderstanding of the DMCA safe harbors, which protect against "direct, vicarious, and contributory infringement." H.R. Rep. No. 105-551, pt. 2, at 50 (1998). Regardless, the elements of contributory and vicarious liability so closely mirror the elements discussed above that there is little else to say. Even if the DMCA did not apply (which it does), and even if Appellant proved direct infringement by a third party (which he did not do),[32] the District Court correctly dismissed Appellant's contributory and vicarious infringement claims.

*First*, Shutterstock is not vicariously liable. As discussed *supra*, the record is clear that Shutterstock had no "right or ability to supervise" the Licensees and/or API User Platforms' alleged infringement, nor any "direct financial interest in such

---

[32] Except for lawsuits against several Licensees, which have not been decided, Appellant has not sued any uploaders for direct infringement. A.268 ¶ 53; A.272 ¶ 77. Shutterstock cannot be secondarily liable absent direct infringement. *Matthew Bender & Co., Inc. v. W. Pub. Co.*, 158 F.3d 693, 706 (2d Cir. 1998). Additionally, Appellant fails to distinguish between direct and indirect infringement; Shutterstock cannot be both directly and secondarily liable for the same conduct. *Pickholtz v. Rainbow Techs., Inc.*, 260 F. Supp. 2d 980, 989-90 (N.D. Cal. 2003).

activities." *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159,

1162 (2d Cir. 1971); *see* A.254-55 ¶¶ 59, 62. As with the DMCA, "the central

question of the 'direct financial benefit' inquiry [for vicarious liability] is whether

the infringing activity constitutes a draw for subscribers, not just an added benefit."

*Ellison v. Robertson,* 357 F.3d 1072, 1079 (9th Cir. 2004); *see also Arista Records*

*LLC v. Lime Grp., LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011) (there must be

a "causal relationship between the infringing activity and any financial benefit

[the] defendant reaps"); *compare* 17 U.S.C. § 512(c)(1)(B). There is no evidence

Shutterstock attracted any customers *because of* the allegedly infringing Images,

nor that it lost customers upon removal. Shutterstock operates a legitimate

marketplace, and the existence of a small number of allegedly infringing images

among *hundreds of millions* of images cannot plausibly have created a sufficient

"draw" to impose liability.

   *Second*, contributory infringement only exists where a party supplies an

instrumentality or other support with knowledge that it is being used to infringe.

*See Matthew Bender*, 158 F.3d at 706; *compare* 17 U.S.C. § 512(c)(1)(A), (C). To

be a contributory infringer, the defendant "must have acted in concert with the

direct infringer" and its "participation in the infringement must be substantial."

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 357

(S.D.N.Y. 2014) (citation omitted). Here, Shutterstock had no knowledge of, nor

any reason to suspect, the Contributors' alleged infringing activity when the Images were available on its website or at any other time. A.265-67 ¶¶ 38-40, 44, 49. Shutterstock removed images expeditiously even when the notice did not come from Appellant or involve his Images. A.265-68 ¶¶ 36, 45-46, 50. Merely "provid[ing] the means to accomplish an infringing activity" is not enough. *Wolk*, 840 F. Supp. 2d at 750.

## III. THE DISTRICT COURT CORRECTLY DISMISSED APPELLANT'S SECTION 1202 CLAIMS AS A MATTER OF LAW

### A. Shutterstock's Use of a "Shutterstock" Watermark Does Not Violate § 1202(a).

Section 1202(a) prohibits the provision or distribution of false copyright management information ("CMI") "knowingly and with the intent to induce, enable, facilitate, or conceal infringement." 17 U.S.C. § 1202(a). It is key that the defendant *both* "knowingly provided false [CMI] *and* that [it] did so with the intent to induce, enable, facilitate, or conceal an infringement." *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir. 2018). This is known as the "double scienter requirement." *Id.* Appellant claims that Shutterstock's addition of a "Shutterstock" watermark to the Images violates § 1202(a), but he skips the double-scienter test. The District Court correctly held that "neither required element [of the claim] is met," SPA.20 (citation omitted), and Appellant does not contend otherwise.

*First*, the "Shutterstock" watermark is not false. It *truthfully* identified

52

Shutterstock as the source or distributor of the Images. A.262 ¶ 19. Appellant

offers no evidence to rebut this. Instead, Appellant relies (Br. 51-52) on two

inapposite cases,[33] one of which expressly acknowledges—and does not disagree

with—the decision in *Steinmetz* that Shutterstock's similar watermark "was ***not***

***false CMI*** but instead 'identifie[d] [Shutterstock] as the source of an image

downloaded from its portfolio or platform.'" *Post*, 2023 WL 5507845, at *5

(quoting *Steinmetz*, 629 F. Supp. 3d at 85) (emphasis added).

     *Second*, Appellant does not and cannot dispute that Shutterstock lacked the

requisite double scienter, because there is no evidence that Shutterstock added the

watermark with the requisite intent. *See* SPA.20-21.[34] Rather, it is undisputed that

Shutterstock's system *automatically* added the watermark to the Images—as it

does for *all images* made available on its website—in order to *prevent*

infringement. A.262 ¶ 18; *see also Steinmetz*, 629 F. Supp. 3d at 85 (dismissing

§ 1202(a) claim on summary judgment, because watermark's purpose was to

prevent infringement); *Zuma Press, Inc. v. Getty Images (US), Inc.*, 349 F. Supp.

---

[33] Both cases—*Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370
(S.D.N.Y. 2021), and *Post Univ. v. Course Hero, Inc.*, No. 3:21-CV-1242-JBA,
2023 WL 5507845 (D. Conn. Aug. 25, 2023)—were decided on the pleadings, not
summary judgment. *See* SPA.20, n.9 (distinguishing *Penske*).

[34] Although it has done so, Shutterstock is not required to "prove that it lacked the
requisite scienter." Br. 52. Rather, Appellant must show that Shutterstock exhibited
the requisite knowledge and intent. *See Steinmetz*, 629 F. Supp. 3d at 85 (plaintiff
has burden to show double scienter).

3d 369, 375-76 (S.D.N.Y. 2018) (same).[35] Appellant's contention that this issue is "inappropriate for resolution by summary judgment" (Br. 52 (citing *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180 (9th Cir. 2016)) is unfounded.[36] *See American Tel. & Tel. Co. v. N.Y.C. Human Res. Admin.*, 833 F. Supp. 962, 974 (S.D.N.Y. 1993), *as corrected* (Sept. 20, 1993) (summary judgment may be proper "even where the issue . . . is one of motivation or intent.") (collecting cases); *see also, e.g.*, *Thron v. HarperCollins Publishers, Inc.*, No. 01-CV-5437-JSR, 2002 WL 1733640, at *1 (S.D.N.Y. July 26, 2002).

Appellant also argues that Shutterstock "provided false CMI to its third-party API [User Platforms] and Licensees." Br. 54. As noted, the watermark is not "false." Moreover, the API delivery processes are *automatic* and thus, for the same reasons discussed *supra*, do not violate § 1202(a) as a matter of law. Indeed, the undisputed evidence shows that Shutterstock's system automatically made the

---

[35] All but one of the cases that Appellant cites regarding double scienter (Br. 52-53) were decided on a Rule 12(b)(6) motion to dismiss, at which point, "intent and knowledge [need only] be alleged generally." *Michael Grecco Prods., Inc. v. Alamy, Inc.*, 372 F. Supp. 3d 131, 139 (E.D.N.Y. 2019) (citation omitted). The one exception—*Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368 (S.D.N.Y. 2019), *aff'd*, 970 F.3d 167 (2d Cir. 2020)—is highly distinguishable. *Id.* at 169, 173 (affirming finding of § 1202(a) violation after trial, where a journalist altered photographer's credit to falsely attribute source knowingly).

[36] Appellant's reliance on *Friedman* is misplaced. Unlike here, the plaintiff in *Friedman* already "had [ ] discharged *his* burden of production at summary judgment" of evidence giving rise to "a reasonable, if not particularly strong, inference" of knowledge. *Friedman*, 833 F.3d at 1189.

54

Images (and millions of other images) accessible to the API User Platforms. A.255-57 ¶¶ 60, 63, 65-66. Likewise, Shutterstock's system automatically delivered the Images to the Licensees on-demand—and those copies were not even watermarked. A.262 ¶ 21.

### B.    Shutterstock Did Not Remove CMI in Violation of § 1202(b).

Section 1202(b) prohibits "intentionally remov[ing] or alter[ing] any [CMI]" or "distribut[ing] . . . copies of works . . . knowing that copyright management information has been removed or altered without authority of the copyright owner." 17 U.S.C. § 1202(b)(1), (3). The same "double scienter requirement" applies. *Id.* § 1202(b).

Appellant does not argue this core element at all. He argues that the District Court erred in dismissing his claim because there is "a triable issue as to whether Shutterstock removed [ ] CMI" from the Images. Br. 55. Appellant is wrong, for multiple reasons. First, Appellant conceded that many of the Images contained no CMI when Shutterstock received them. A.268 ¶ 54; A.275 ¶ 3. The District Court correctly concluded that "[Appellant's] Section 1202(b) claim must fail as to those [I]mages." SPA.21; *accord Craig v. UMG Recordings, Inc.*, 380 F. Supp. 3d 324,

338 (S.D.N.Y. 2019) (dismissing § 1202(b) claim where plaintiff failed to show photographs included CMI when defendants received them).[37]

As to the remaining Images, Appellant's § 1202(b) claim fails as a matter of law because, as the District Court highlighted, Appellant has not adduced any evidence supporting the requisite double-scienter. SPA.21. To the contrary, the record makes clear that Shutterstock's system automatically separates any and all metadata (including CMI) from contributor-submitted images during the ingestion process—before any person at Shutterstock comes in contact with them—for various legitimate reasons. A.241 ¶ 15; A.251 ¶¶ 47-48. Moreover, unlike the defendants in the cases Appellant cites, Shutterstock had good reason to believe its distribution of the Images would not infringe anyone's rights. A.239 ¶ 8; *see, e.g.*, *Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922, 926 (6th Cir. 2003) (rejecting § 1202(b) claim where defendant's personnel believed use was authorized).[38]

---

[37] Even if true, Appellant's claim that he "regularly publishes his photography with CMI" (Br. 55) is immaterial.

[38] All of the cases that Appellant cites in support of his § 1202(b) claim are inapposite. *Shihab v. Complex Media, Inc.*, No. 21-CV-6425-PKC, 2022 WL 3544149 (S.D.N.Y. Aug. 17, 2022), was decided on a motion to dismiss. And, like *Mango* (*see supra* n.35), *Friedman* is highly distinguishable because "Live Nation ha[d] *never* offered *any* explanation of how it came to possess the images." *Friedman*, 833 F.3d at 1188.

On appeal, Appellant ignores these fatal problems, arguing instead that "it would be unfair to burden [him] at the summary judgment stage with proving" the requisite intent. Br. 56.[39] But as discussed *supra*, summary judgment is appropriate where, as here, the plaintiff does not proffer evidence that the defendant acted with the requisite knowledge or intent. Indeed, courts have repeatedly dismissed § 1202(b) claims on summary judgment where the plaintiffs failed to show a genuine issue regarding the defendant's scienter. *See, e.g.*, *Thron*, 2002 WL 1733640, at *1; *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018) (affirming dismissal of § 1202(b) claim on summary judgment). Because there is no evidence Shutterstock acted with the requisite intent, this Court should affirm the dismissal of Appellant's § 1202(b) claim.

## CONCLUSION

The longstanding existence of Shutterstock's platform, and those of its competitors, demonstrates that the DMCA has worked as intended: providing enforcement mechanisms to creators, opportunities for distribution of creative works online between creators and consumers, and protection to Shutterstock from being unable to operate due to the very concerns that led to the passage of the

---

[39] Appellant fails to reconcile this with his affirmative motion for summary judgment on his § 1202(b) claim.

DMCA. Accordingly, Judge Rearden's well-reasoned decision below should be affirmed.

Respectfully submitted,

Dated: New York, New York
May 14, 2024

MITCHELL SILBERBERG & KNUPP LLP

By: /s/ Eleanor M. Lackman
Eleanor M. Lackman (eml@msk.com)
Marissa B. Lewis (mbl@msk.com)
437 Madison Avenue, 25th Floor
New York, New York 10022
Tel.: (212) 509-3900
Fax: (212) 509-7239

*Attorneys for Defendant-Appellee Shutterstock, Inc.*

## **Federal Rules of Appellate Procedure Form 6.**

## **Certificate of Compliance with Rule 32(a)**

Certificate of Compliance with Type-Volume Limitation,

Typeface Requirements and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point, Times New Roman.

Dated: New York, New York        MITCHELL SILBERBERG & KNUPP LLP
May 14, 2024

By: /s/ Eleanor M. Lackman
Eleanor M. Lackman (eml@msk.com)
Marissa B. Lewis (mbl@msk.com)
437 Madison Avenue, 25th Floor
New York, New York 10022
Tel.: (212) 509-3900
Fax: (212) 509-7239

*Attorneys for Defendant-Appellee*
*Shutterstock, Inc.*